# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-3297

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BEVERLY A. MARTY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 05-CR-0029-C—**Barbara B. Crabb**, *Chief Judge.*

ARGUED APRIL 7, 2006—DECIDED JUNE 12, 2006

Before FLAUM, *Chief Judge,* and POSNER and EASTERBROOK, *Circuit Judges.*

FLAUM, *Chief Judge.* Beverly A. Marty pled guilty to maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1). After finding the amount of oxycodone attributable to Marty was greater than the quantity recommended by the parties in their plea agreement, the district court sentenced Marty to seventy-eight months' imprisonment. Marty now appeals that sentence, claiming that the district court abused its discretion in calculating her relevant conduct.

For the following reasons, we now affirm the judgment of the district court.

## I. Background

Between July 1, 2004, and January 31, 2005, the defendant-appellant, Beverly A. Marty, sold OxyContin out of her home in Madison, Wisconsin. Pursuant to a warrant, the police searched Marty's home and found 16 empty OxyContin bottles (each bearing Marty's name and labeled as containing 450 pills), $2,450 in U.S. currency, marijuana, drug paraphernalia, and a "Triple-Beam" scale.

On February 24, 2005, a federal grand jury charged Marty and her husband, Alan M. Marty, with maintaining a drug-involved premises for the purpose of distributing OxyContin, a Schedule II controlled substance, in violation of 21 U.S.C. § 856(a)(1); and forfeiture of the real property used to facilitate the offense in accordance with 21 U.S.C. § 853.

Pursuant to a plea agreement, Marty pled guilty to Count One of the indictment and agreed to the forfeiture in Count Two. The government agreed to recommend "that the court find that the drug amount attributable to the defendant under advisory guideline § 2D1.1 is between 100 to 400 kilograms of marijuana (after converting the oxycodone to marijuana under the guidelines)." In the plea agreement and as part of a subsequent plea colloquy, Marty acknowledged that no sentencing promises had been made, that the district court was not required to accept the recommendation made by the government, and that the district court was free to impose a sentence up to the statutory maximum.

The Presentence Investigation Report ("PSI"), prepared by the United States Probation Office, calculated Marty's base offense level to be 30. The PSI found $70,000 in excess deposits over legitimate income in Marty's bank account. The PSI divided this sum by a sale value of $40 per pill,

thereby estimating total sales of 1,750 pills,[1] the marijuana equivalent of 844.2 kilograms. This estimate was a significant increase from the 100 to 400 kilogram recommendation contained in the plea agreement. The PSI also recommended a three-level decrease for acceptance of responsibility, yielding a total offense level of 27.

Marty objected to the PSI's computations and filed two alternative calculations. In her first alternative calculation, Marty contended that her bank account contained $55,192.68 from drug sales, not $70,000. In Marty's second alternative calculation, she alleged that the 100 to 400 kilogram recommendation in the plea agreement was correct because not every deposit in the account was related to drug sales. Marty requested that the district court find a marijuana equivalent of between 100 and 400 kilograms.[2]

The probation office filed an addendum to the initial PSI, in which it agreed that the proceeds from drug sales attributable to Marty should be reduced to $55,192.68. Using this revised cash total, the new PSI calculation found Marty responsible for the sale of 1,379 pills, the equivalent of 665.3 kilograms of marijuana (between 400 to 700 kilograms for the purposes of the Sentencing Guidelines).[3] Under the Sentencing Guidelines, 665.3 kilograms of

---

[1] Several witnesses indicated Marty received $1,000 for 25 pills.

[2] This second alternative offered by Marty would have resulted in a base offense level of 26, which, after accounting for a three-level decrease for acceptance of responsibility, would yield a total offense level of 23 and a Sentencing Guideline range of 51-63 months' imprisonment.

[3] The PSI arrived at the marijuana equivalent by first estimating that each of the 80-milligram OxyContin pills contained approximately 90% oxycodone. Using this estimation and multiplying it by 1,379 pills, the PSI found that Marty was responsible for 99.3 grams of oxycodone, or the equivalent of 665.3 kilograms of marijuana.

marijuana yields a base offense level of 28. The district court approved a three-level reduction for acceptance of responsibility under § 3E1.1(a) and (b) of the Guidelines, for a total offense-level of 25, and found Marty had a criminal history category of II. Thus, the district court found a range of 63-78 months' imprisonment appropriate under the Sentencing Guidelines.

In its addendum to the PSI, the probation office stated that these figures represent a conservative estimate of Marty's total culpability. The district court also recognized the conservative nature of the PSI's estimate, noting that it "leaves out the stash of money that was found in Ms. Marty's safe when the house was searched," and noted that if it had "relied on . . . the witnesses who were involved in purchasing the OxyContin," Marty would have been held responsible for "a lot higher drug amount."

The district court rejected Marty's argument that she should be sentenced based upon the plea agreement's recommendation that the total drug amount attributable to Marty was between 100 and 400 kilograms of marijuana. The district court noted that Marty was responsible for distributing a large amount of OxyContin in the area, used Medicare to obtain pills, fronted drugs to other individuals for them to sell, had been undeterred by previous "contacts with the criminal justice system," and was on bond for another offense at the time of the instant offense. The district court sentenced Marty to 78 months' imprisonment, the high end of the applicable Sentencing Guideline range.

## II. Discussion

Marty claims that the district court erred in its calculation of the drug quantity attributable to her.

Factual findings, such as the quantity of drugs attributable to a defendant, are reviewed for clear error. *United*

*States v. Cross*, 430 F.3d 406, 410 (7th Cir. 2005) (citing *United States v. Souffront*, 338 F.3d 809, 832 (7th Cir. 2003)). This Court will reverse the district court's sentence only if "after reviewing the entire record, we are left with the firm and definite conviction that a mistake has been made." *Id.* (quoting *United States v. Brumfield*, 301 F.3d 724, 730 (7th Cir. 2002)).

The government lived up to the terms of the plea agreement in this case. It recommended that the district court find that the drug amount attributable to Marty was the same amount stated in the plea agreement. The district court, however, rejected the plea agreement's recommendation and relied upon the PSI in making its assessment of responsibility. The PSI was reasonable and based on solid evidence. In fact, the PSI's estimate of 1,379 pills is a *very* conservative figure given the other evidence that the district court could have used to reach a higher total.

Clear error will not be found where two permissible views of the evidence exist. *E.g.*, *Anderson v. City of Bessemer*, 470 U.S. 564, 573-74 (1985). District courts may make "reasonable estimations" of the quantity of drugs for which a defendant is responsible. *United States v. Joiner*, 183 F.3d 635, 640 (7th Cir. 1999); *see also United States v. Rodriguez*, 67 F.3d 1312, 1325 (7th Cir. 1995) ("Recognizing that drug dealers ordinarily do not use invoices and bills of lading, we have held that sentencing courts may make reasonable estimates as to drug quantities." (citations omitted)).

To calculate the quantity of drugs attributable to Marty, the district court divided a conservative estimate of Marty's profit by the known selling price of an OxyContin pill. This simple calculation allowed the district court to estimate the total quantity of drugs for which Marty bears responsibility. Such extrapolation is a necessary and long-sanctioned judicial procedure. *See United States v. Durham*, 211 F.3d 437, 444 (7th Cir. 2000); *United States v. Patel*, 131 F.3d 1195, 1203 (7th Cir. 1997); *United States v. Rivera*, 6 F.3d

431, 446 (7th Cir. 1993); *see also* U.S. SENTENCING GUIDE-LINES MANUAL § 2D1.1 cmt. n.12 (2004).

Marty disputes the district court's calculations, claiming that although "[t]he total amount of pills she would have had access to was 5850[,]" the district court erred by holding her responsible for the sale of 1,379 pills. She alleges that the sentencing court neglected to account for her personal use of "legally prescribed . . . pills that she obtained monthly from her physician." Marty provides no support, however, for this claim or her statement that "given the addictive nature of oxcyontin [sic] and Beverly Marty's use of it," it is more likely that she would have sold "10 percent of what she was prescribed" rather than 25 percent.[4]

Even if we were to consider Marty's view of the evidence as a reasonable alternative, which we do not, an alternative view of evidence does not constitute clear error. "Where there are two permissible views of the evidence, the

---

[4] The danger that arises from the sale, misuse, and abuse of OxyContin is not excused by its status as a prescription painkiller. While Marty may have obtained her pills from a pharmacy, rather than a drug dealer, her crime still poses a grave danger to the community. *See* NATIONAL DRUG INTELLIGENCE CENTER, U.S. DEPARTMENT OF JUSTICE, INTELLIGENCE BULLETIN: OXYCONTIN DIVERSION, AVAILABILITY AND ABUSE (Aug. 2004), http://www.usdoj.gov/ndic/pubs10/10550/10550p.pdf; GENERAL ACCOUNTING OFFICE, REPORT TO CONGRESSIONAL REQUESTERS, PRESCRIPTION DRUGS: OXYCONTIN ABUSE AND DIVERSION AND EFFORTS TO ADDRESS THE PROBLEM, GAO-04-110 (Dec. 2003), http://www.gao.gov/new.items/d04110.pdf; Michael Janofsky, *Drug-Fighters Turn to Rising Tide of Prescription Abuse*, N.Y. TIMES, Mar. 18, 2004, at A24. "Law enforcement officials around the country have been wrestling with an epidemic of prescription drug abuse, especially of powerful painkillers such as OxyContin, popularly known as 'hillbilly heroin.'" *Prescription Drug Abuse Rises To 'Epidemic' Level*, L.A. TIMES, Jul. 11, 2005, *available at* 2005 WLNR 23350246.

factfinder's choice between them cannot be clearly errone-ous." *City of Bessemer*, 470 U.S. at 574 (citing *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949); *Inwood Labora-tories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 (1982)).

In her attempt to convince this Court that the district court was bound to follow the plea bargain's recommenda-tion, Marty cites *United States v. Curtis*, 336 F.3d 666 (8th Cir. 2003), for the proposition that a district court is bound to follow the parties' stipulation as to the drug amount attributable to the defendant. For several reasons, *Curtis* is inapposite. In *Curtis*, the parties stipulated that a defen-dant possessed at least a particular quantity of drugs. *Id.* at 670. In contrast, in the instant case the government agreed only to *recommend* that the quantity of drugs attributable to Marty was the sentencing equivalent of 100 to 400 kilograms of marijuana.

The plea agreement specifically states that "the Court is not required to accept any recommendations which may be made by the United States and that the Court can impose any sentence up to and including the maximum penalties." The district court warned Marty of this fact during the plea colloquy. Our case law has clearly established that a district court is not required to follow the government's sentencing recommendations. *See, e.g.*, *United States v. Lopez*, 430 F.3d 854 (7th Cir. 2005); *United States v. Gaertner*, 593 F.2d 775 (7th Cir. 1979).

As a final matter, we note that given the record in this case, the district court's specific findings, and the district court's consideration of the factors set forth in 18 U.S.C. § 3553(a), we have no reason to suspect that Marty's sentence of 78 months' imprisonment, well below the statutory maximum of 20 years pursuant to 21 U.S.C. § 856(b), was unreasonable.

## III.  Conclusion

For the above stated reasons, we AFFIRM the judgment of the district court.

A true Copy:

      Teste:

                           _____

                          *Clerk of the United States Court of*
                               *Appeals for the Seventh Circuit*