In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2262

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MELVIN TAYLOR,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 06 CR 00023—**Theresa L. Springmann**, *Judge.*

ARGUED JANUARY 12, 2010—DECIDED APRIL 8, 2010

Before POSNER, FLAUM and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* On May 24, 2006, defendant-appellant, Melvin Taylor, was indicted, along with Marlyn Barnes, Michael Alexander, Theodis Armstead, Herbert Hightower, and Vernell Brown, for conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846. Taylor was also indicted for carrying a firearm during and in relation to a drug trafficking crime, in violation of

18 U.S.C. § 924(c). After proceeding to trial on April 15, 2008, a jury found Taylor guilty of both counts. Several months later, Taylor filed a motion for a new trial based on newly discovered evidence. The district court denied the motion. At Taylor's sentencing hearing, the district court found that the conspiracy involved forty kilograms of cocaine, which resulted in a sentence of 188 months on the conspiracy count. Taylor appeals his conviction, the district court's denial of his motion for a new trial, and his sentence. For the reasons set forth below, we affirm Taylor's conviction and the district court's denial of a new trial. However, because of an error in the district court's determination of the amount of cocaine attributable to the conspiracy, we vacate the sentence and remand for re-sentencing.

## I. Background

### A. Facts of the Underlying Conspiracy

This conspiracy involved a fake shipment of drugs traveling from Texas to Fort Wayne, Indiana. Barnes, the mastermind of the conspiracy and the person who recruited Taylor, first learned of the fake shipment from Kurt Hunter. Hunter and Barnes had been providing each other with drugs on a regular basis for several months prior to April of 2006. However, Barnes was unaware that Hunter was working as a confidential informant for the government. On April 17, 2006, Hunter and Barnes met to develop a plan to steal a local dealer's stash of drugs. At that meeting, Hunter mentioned the fictional shipment of drugs that became the core of this

conspiracy. Barnes became interested in stealing this fictional shipment rather than going forward with the original plan. On April 23, 2006, Hunter introduced Barnes and Alexander, Barnes's brother, to Agent Wayne Lessner, the undercover agent working with Hunter. Barnes and Alexander believed that Hunter and Agent Lessner were couriers for the drug shipment from Texas. Barnes met with Hunter and Agent Lessner once more that month to discuss the logistics of the heist. Agent Lessner recorded both meetings. During the first meeting with Agent Lessner, Barnes indicated that he had recruited several people to participate in the heist. Barnes told Hunter and Agent Lessner that one of the people he had recruited was a friend named MacMel. Several witnesses at trial testified that Taylor commonly went by the nicknames Mac, Mel, and MacMel. During these two meetings, Hunter and Agent Lessner intentionally never indicated the exact quantity of drugs that would be involved in the shipment because drug couriers would not normally know that information. Although Hunter and Agent Lessner never named an exact amount of drugs, the audiotapes of the meetings capture Barnes making various assumptions about the quantity of drugs involved, ranging from twenty-to-eighty kilograms. After the second meeting, Hunter and Agent Lessner stayed in contact with Barnes, updating him on the progress of the fictional drug shipment. Once it was determined that the heist would occur on May 5, 2006, the government, through Agent Lessner and Hunter, arranged for Barnes and his co-conspirators to stay in two hotel rooms under video surveillance at the Knights

Inn in Fort Wayne, Indiana for the nights of May 3 and May 4, 2006.

Between April 17, 2006, when he first learned of the fictional shipment, and May 3, 2006, when he traveled to Fort Wayne, Barnes compiled his team to carry out the heist. At trial, Hightower testified that Barnes recruited him to the conspiracy in April of 2006. Hightower testified that Barnes told him that the plan was to rob fifty kilograms of cocaine from a stash house in Fort Wayne with Taylor and two individuals recruited by Taylor. Brown and Armstead, two of the other co-conspirators, testified that Taylor recruited them in April of 2006. Armstead also testified that prior to going to Fort Wayne, he understood this to be a "lifetime deal" involving about forty kilograms of cocaine.

On May 3, 2006, Barnes and Hightower traveled from Gary, Indiana to Fort Wayne to meet with Agent Lessner. At trial, there was conflicting testimony about what happened when they were leaving Gary. Barnes testified that they went directly to Fort Wayne. Hightower testified that they stopped at Taylor's house on their way out of Gary. According to Hightower, who claims to have stayed in the car while Barnes went into Taylor's house, Taylor came out of the house, got a bag out of his car, and gave the bag to Barnes. Barnes then gave the bag to Hightower. Inside the bag, Hightower saw a Keltec automatic rifle and a bulletproof vest. Hightower took an AK-47 from the car and put it into the bag.

The next day, Taylor, Brown, and Armstead traveled from Gary to Fort Wayne. Brown testified that they dis-

cussed the plan to steal the load of drugs on the drive. When they arrived in Fort Wayne, they saw Barnes in his car at an intersection and followed him to the Knights Inn. After meeting Barnes at the Knights Inn, Taylor, Brown, and Armstead went to visit Taylor's uncle at the nearby Applebee's. Several hours later, Taylor, Brown, and Armstead returned to the Knights Inn and joined a meeting with Agent Lessner, Hightower, Alexander, and Barnes in one of the hotel rooms. The government introduced a videotape of this meeting at trial. During the meeting, Agent Lessner discussed the logistics of the shipment and how they would carry out the heist, but stopped short of mentioning the specific amount of drugs that would be involved. In response to a question from Alexander, Agent Lessner did tell the group that the drugs would be in the fuel tank and described the fuel tank as the size of the dresser in the room. The meeting lasted thirty minutes. The videotape shows Taylor sitting on the bed and participating in the meeting on three occasions: he commented on the type of truck that would be involved; he informed Barnes that Youngstown was in Ohio; and he described a person who would be involved in the heist and how he would be armed.

On the morning of May 5, 2006, Agent Lessner called Barnes to tell him everything was ready. Barnes took the bag with the bulletproof vests and guns. Barnes and Hightower rode with Agent Lessner to the storage facility to pick up the van that they were planning to use in the heist. Taylor drove behind Agent Lessner's car with Armstead and Brown. Once they arrived at the

storage facility, the group was arrested. The arresting officers found a .40-caliber handgun and three additional loaded magazines on Taylor.

## B.  Procedural History

On September 18, 2007, Barnes, Armstead, Brown, and Taylor proceeded to trial. Alexander and Hightower pleaded guilty prior to September of 2007. Early in the September 2007 trial, Armstead, Brown, and Taylor moved for a mistrial when Barnes agreed to testify on their behalf. The court granted the mistrial and severed Barnes's trial from the other defendants. Barnes proceeded to trial alone in February of 2008 and was found guilty. Armstead and Brown then pleaded guilty, and in April of 2008, Taylor proceeded to trial as the only remaining defendant. Armstead, Brown, and Hightower testified against Taylor at his trial. Barnes testified on Taylor's behalf. Barnes denied ever talking to Taylor about the heist before May 4, 2006 and claimed it was a coincidence that they ran into each other in Fort Wayne on May 3, 2006. The jury found Taylor guilty.

In October of 2008, Taylor filed a motion for a new trial based on a post-sentencing statement of Alexander, and then filed an amended motion based on a post-sentencing statement of Brown. Alexander claimed that Taylor did not know about the conspiracy and was only in Fort Wayne to visit his uncle. Brown claimed that he pleaded guilty and testified against Taylor out of fear of a life sentence, but that he and Taylor had never spoken of the drug heist. The district court denied the motion. In

rejecting Alexander's statement, the district court reasoned that all of the information in Alexander's statement was information known to Taylor prior to trial, and therefore was not newly discovered evidence. Additionally, the district court found that Alexander's statement was weak exculpatory evidence because it directly contradicted Alexander's plea colloquy. The district court rejected the motion based on Brown's affidavit because it was not reasonably well satisfied that Brown's trial testimony was false.

On May 4, 2009, the district court sentenced Taylor to 188 months for the conspiracy charge and sixty months for the gun charge. Taylor was the last of the co-conspirators to be sentenced. Taylor's pre-sentence report recommended that the district court find that the conspiracy involved forty kilograms of cocaine. Taylor objected to this recommendation and urged the court to find that the conspiracy involved five-to-fifteen kilograms. Notwithstanding Taylor's objection, the district court made the factual finding that the conspiracy involved forty kilograms of cocaine. The district court had made the same finding of forty kilograms when sentencing Barnes, but had previously accepted stipulations that the conspiracy involved only five-to-fifteen kilograms of cocaine when sentencing Alexander, Hightower, Brown, and Armstead. The factual determination that the conspiracy involved forty kilograms resulted in a base offense level of 34. With a two-point enhancement not challenged in this appeal, Taylor's offense level was 36, which resulted in an advisory guideline range of 188 to 235 months. Had the district court found that the con-

spiracy involved five-to-fifteen kilograms, the advisory guideline range would have been 151 to 188 months.

## II. Discussion

### A. Sufficiency of the Evidence for the Conspiracy Count

Taylor challenges his conviction, claiming that the government presented insufficient evidence to prove beyond a reasonable doubt that he conspired with Barnes, Hightower, Alexander, Armstead, and Brown to possess with intent to distribute more than five kilograms of cocaine. When assessing a sufficiency of the evidence claim, our threshold inquiry is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003) (internal citations omitted). We do not re-weigh the evidence or determine the credibility of witnesses. *United States v. Longstreet*, 567 F.3d 911, 918 (7th Cir. 2009). To convict a defendant of conspiracy to possess with intent to distribute cocaine under 21 U.S.C. § 846, the government must establish: (1) the existence of an agreement between two or more persons to possess with intent to distribute cocaine; (2) that the defendant knew of the agreement; and (3) the defendant intended to join the agreement. *See United States v. Billops*, 43 F.3d 281, 284 (7th Cir. 1994). "[M]ere association with conspirators, knowledge of a conspiracy and presence during conspiratorial discussions is not sufficient to convict a

person of conspiracy." *United States v. Useni*, 516 F.3d 634, 646 (7th Cir. 2008).

Taylor argues that the government presented such limited and unreliable evidence that no reasonable juror could have found him guilty of being involved in the conspiracy beyond a reasonable doubt. Taylor claims that he was only in Fort Wayne to visit his uncle, that he had no knowledge of the plan to steal the drug shipment until the meeting at the Knights Inn on May 4, 2006, and that he was merely present for that meeting but did not participate. To support his claim of non-involvement in the conspiracy, Taylor points to his minimal involvement in the meeting at the Knights Inn and the uncontested fact that he never spoke to the confidential informant. To counter the testimony of Hightower, Armstead, and Brown, all of whom testified that Taylor participated in planning the heist, Taylor argues that their testimony was inconsistent and therefore we should not credit it. The inconsistencies in their testimony generally relate to whether Barnes and Hightower received guns from Taylor on May 3, 2006. Armstead and Hightower testified consistently on the main issue, that Barnes received the guns from Taylor on May 3, 2006, but deviated on who retrieved the guns and where the guns were originally located. Barnes completely denied receiving guns from Taylor.

Although Taylor's arguments may have been valid arguments to put before a jury, they are not enough to support a sufficiency of the evidence challenge on appeal. The government put forth evidence that Taylor

actively participated in the conspiracy and even recruited other individuals to the conspiracy. Hightower testified that he saw Taylor give Barnes guns, that Taylor participated in a conversation about how three people would use two vests, and that Taylor showed up at the hotel with a .40-caliber handgun, three magazines and forty-six rounds of ammunition. Brown, who traveled to Fort Wayne at the urging of Taylor, testified that Taylor knew about the planned drug heist and traveled to Fort Wayne to participate. Armstead testified that Taylor recruited him to the conspiracy and that he knew they were traveling to Fort Wayne to participate in a drug heist. The government also presented an audiotape in which Barnes said that he had recruited an individual named "MacMel," a known nickname for Taylor, and a videotape of Taylor participating in the meeting at the Knight's Inn on May 4, 2006. Although Taylor characterizes his participation at that meeting as minimal, the jurors had an adequate opportunity to assess his involvement in the meeting for themselves. Furthermore, Taylor concedes that he responded to questions and asked questions during the meeting. Taylor essentially asks us to find that the government's evidence was not credible. However, that is not the role of this Court. The government put forth sufficient evidence of Taylor's involvement in the conspiracy. It was the jury's role to assess the credibility of that evidence.

## B.  Motion for a New Trial

Next, Taylor contends that the district court erred by denying his motion for a new trial based on newly dis-

covered evidence. The pieces of newly discovered evidence Taylor refers to are a statement by Alexander, stating that Taylor was not involved in the conspiracy, and a statement by Brown, claiming that Taylor did not have any knowledge of the conspiracy. We review a district court's denial of a motion for a new trial using an abuse of discretion standard. *United States v. Lewis*, 567 F.3d 322, 328 (7th Cir. 2009). The test we apply when considering new evidence not considered at trial is slightly different from the test we apply when considering evidence proving that testimony at trial was false. Therefore, we will take the district court's consideration of each statement in turn.

Alexander signed an affidavit exculpating Taylor after he received the benefit of his plea agreement at sentencing. Alexander claims that Taylor had nothing to do with the plan to steal the drugs, that Taylor was only in Fort Wayne to visit his uncle, and that Taylor fell asleep during the meeting at the Knights Inn. Neither the government nor Taylor called Alexander as a witness at trial. To determine whether this is new evidence such that it warrants a new trial, we must consider whether it: (1) came to Taylor's knowledge only after trial; (2) could not have been discovered sooner had Taylor exercised due diligence; (3) is material and not merely impeaching and cumulative; and (4) would probably lead to an acquittal in the event of a retrial. *See United States v. Bender*, 539 F.3d 449, 455-56 (7th Cir. 2008). Alexander's statement does not qualify as newly discovered evidence to warrant a new trial. Taylor was aware of his own involvement in the conspiracy, or lack

thereof, from the beginning and could have called Alexander to testify on his behalf at trial. Taylor offers no reason why he did not call Alexander as a witness. In the absence of another explanation, we may assume that Taylor did not call Alexander to testify because Alexander expressed an unwillingness to testify, or an unwillingness to testify in a way that would benefit Taylor. However, that does not make the facts to which Alexander would have testified newly discovered evidence. Taylor also offers no clear argument demonstrating that this testimony would lead to an acquittal in the face of the testimony of Armstead and Hightower (we do not consider Brown's testimony in this analysis because he has recanted). Alexander's testimony would have corroborated Barnes's testimony, but the jury chose to disregard Barnes's testimony because of its internal inconsistencies and its inconsistencies with the testimony of the other witnesses and the physical evidence. Alexander would not have made a much more believable witness than Barnes. If Alexander testified at a new trial, his testimony would directly contradict his plea colloquy, which the government certainly would bring out on cross-examination. It also would be inconsistent with the other testimony and the physical evidence. For these reasons, the district court did not abuse its discretion in determining that Alexander's statement does not meet the requirements to warrant a new trial.

Unlike Alexander, Brown did testify against Taylor at his trial. Brown's affidavit now recants that testimony. Because this new evidence deals with allegedly false testimony at trial, we must consider whether: (1) we are

reasonably well satisfied that the testimony given by Brown at trial was false; (2) the jury might have reached a different conclusion absent the false testimony or if it had known Brown's testimony was false; and (3) Taylor was taken by surprise when the false testimony was given, and was unable to meet it or did not know its falsity until after the trial. *See United States v. Bender*, 539 F.3d 449, 456 (7th Cir. 2008). Brown's statement that Taylor had no knowledge of the plan to steal drugs does not meet the first prong of the analysis. Brown's trial testimony was consistent with the testimony of two other witnesses, the videotape of the meeting, and the .40-caliber handgun found on Taylor. His new statement contradicts all of these corroborated pieces of evidence. Brown's statement also does not meet the third prong of the analysis. If Brown's trial testimony was false, Taylor would have known that it was false at the time of trial because the testimony Brown now recants dealt exclusively with Taylor's knowledge of and involvement in the conspiracy. Taylor had ample opportunity to refute the testimony through cross-examination. For these reasons, the district court did not abuse its discretion in determining that Brown's new statement does not meet the requirements for newly discovered evidence to warrant a new trial.

## C.  Sentencing

Lastly, Taylor argues that the district court erred in its determination that the amount of cocaine attributable to the conspiracy was forty kilograms when calculating the

appropriate sentencing guideline range. We review a district court's factual finding regarding drug quantity for clear error. *United States v. Clark*, 538 F.3d 803, 812 (7th Cir. 2008). The government has the burden of proving the quantity of drugs attributable to the defendant. *United States v. Krasinski*, 545 F.3d 546, 551 (7th Cir. 2008). The evidence on which the district court relies must have "sufficient indicia of reliability to support its probable accuracy." *United States v. Bautista*, 532 F.3d 667, 672 (7th Cir. 2008).

As an initial matter, the government argues that this sentence is not reviewable because it falls within the lower guideline range that Taylor advocates should apply. However, a district court's decision to sentence a defendant within the overlap of two guideline ranges does not automatically insulate a sentence from review. *Emezuo v. United States*, 357 F.3d 702, 710-11 (7th Cir. 2004). Only when it is clear from the sentencing record that the district court would have applied the same sentence even if the lower range applied will we decline to review a sentence. *Id.* The government points to no statements in the record that indicate that the district court would have given the same sentence had it started with the lower range. Therefore, we will proceed to the review of the district court's factual determinations in coming to this sentence for clear error.

To support the district court's finding that the conspiracy involved forty kilograms of cocaine, the government points to several key pieces of evidence on which the district court relied. First, Agent Lessner testified

that he told all the parties in the hotel room meeting, including Taylor, that the cocaine would be in the fuel tank of the truck, which he compared to a dresser in the room roughly large enough to hold forty kilograms. This testimony was also supported by the videotape of that meeting. Taylor argues that this is not sufficient evidence to support the finding of forty kilograms because Agent Lessner only said that the drugs would fit in the fuel tank, but did not say that the drugs would fill the fuel tank. The government also points to the testimony of Armstead and Hightower. Armstead, Taylor's recruit to the endeavor, testified that he believed the quantity of drugs involved was forty kilograms when he agreed to participate. Hightower testified that Barnes told him that the heist involved fifty kilograms of cocaine. While this record to support the factual finding that the conspiracy involved forty kilograms of cocaine is thin, it would probably be enough to support such a factual finding. However, this case presents an additional challenge.

This conspiracy involved six co-conspirators. Four of the co-conspirators pleaded guilty before going to trial. Barnes and Taylor did not plead guilty. The district court did not sentence any of the defendants until after the trials of Barnes and Taylor. Therefore, the district court had the exact same factual record before it with regard to the amount of drugs involved in the conspiracy when sentencing all of the defendants. The plea agreements of the four cooperating co-conspirators stipulated that the conspiracy involved five-to-fifteen kilograms of cocaine. Had the district court found that the evidence

in the record did not support this factual stipulation, it had the authority to reject the stipulation at sentencing and make a factual finding consistent with the evidence. U.S.S.G. § 6B1.4(d). The district court did not do this. The district court accepted this factual stipulation and sentenced these four co-conspirators on the finding that the conspiracy involved five-to-fifteen kilograms of cocaine. Then, at the sentencing hearings for Barnes and Taylor, the district court found that the conspiracy involved forty kilograms of cocaine. The district court did not explain the discrepancy in its factual findings regarding the drug quantity among the co-defendants. Rather, at Barnes's sentencing hearing, the district explicitly stated that there was no reason to treat Barnes differently from his co-conspirators with regard to the amount of drugs involved in the conspiracy, but then proceeded to find a different quantity of drugs. Taylor's sentencing record is silent on the issue of how he should be treated with regard to drug quantity in relation to his co-defendants. As the court discussed with regard to Barnes in *United States v. Barnes*, 09-2052, without a justification for treating these co-defendants differently when determining the amount of drugs attributable to the conspiracy, it was clear error for the district court to find one drug quantity for Armstead, Hightower, Brown, and Alexander, and a different drug quantity for Taylor on an identical record.

### III. Conclusion

For the reasons set forth above, we AFFIRM Taylor's conviction and the district court's denial of the motion

for a new trial. We VACATE Taylor's sentence and REMAND for re-sentencing.