In the

# United States Court of Appeals
## For the Seventh Circuit

Nos.  10-3447, 10-3469, 10-3714, 11-1090, 11-1240,
      11-1509, 11-1680, 11-2630

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KENNETH L. BLOCK, *et al.*,

*Defendants-Appellants*.

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
No. 09 cr 50041—**Frederick J. Kapala**, *Judge*.

ARGUED FEBRUARY 16, 2012—DECIDED FEBRUARY 1, 2013

Before POSNER, RIPPLE, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* This consolidated criminal appeal involves eight defendants who participated in a large heroin distribution conspiracy that operated out of Rockford, Illinois. Each pled guilty to one count of conspiracy to possess with intent to distribute more than one kilogram of heroin and more than fifty grams of cocaine base. The principal argument on appeal is that

the district court failed to make a conservative drug quantity calculation for sentencing purposes. But for the reasons explained further below, we find the district court did not err and carefully examined the evidence from a variety of sources before determining that the conspiracy distributed 700 grams of heroin per week. Defendants Nathaniel Clay and Robert Cobb mount other separate objections to their sentences. Clay essentially argues that the district court failed to consider the sentencing disparities between drug runners, like himself, who were prosecuted in federal court and those prosecuted in state court. Cobb claims that the district court failed to address each of the factors under 18 U.S.C. § 3553(a) at his sentencing. Neither of these arguments have any merit and so we affirm their sentences. Defendant Samuel Peeples's sentence, however, is more troubling. He received a two-level enhancement under § 2D1.1(b)(1) for the possession of firearms by his co-conspirators. Though we have said before that drugs and firearms often go hand in hand, the enhancement Peeples received for his co-conspirators' firearm possession is not supported by the record. Therefore, we vacate his sentence and remand for resentencing.

## I.  BACKGROUND

In the summer of 2007, Hollis Daniels and others began operating a drug trafficking organization (hereinafter "DTO") in Rockford, Illinois that sold primarily heroin and some crack cocaine. Daniels, the DTO's leader, was

incarcerated at various times throughout 2008, but that did not hurt his drug sales. He set up a drug telephone hotline for customers to call and place their orders from 8:00 a.m. to 11:00 p.m. daily. To meet this level of demand, the DTO employed a group of so-called "caretakers." The caretakers included defendants Kenneth Block, Kenneth Townsend, Robert Cobb, and John Knox. They were responsible for running the daily operations of the DTO, including purchasing raw heroin from suppliers in Chicago and Rockford, "stretching" the heroin by diluting it with an over-the-counter sleep aid, and recruiting and managing the drug runners (*i.e.*, street-level distributors). After the raw heroin was diluted according to Daniels's special formula, the runners—including defendants Nathaniel Clay and Samuel Smith—were supplied with a packet known as a "jab," containing 25 smaller baggies for resale. Each individual baggie contained approximately .10 grams of heroin and was sold to customers for $10. After collecting $250 for selling the entire jab, the runner was supposed to keep $50 and give the remaining $200 to the organization.

Sometime in September or October 2008, Samuel Peeples approached Daniels and asked for a job. Peeples started out as a driver for several of the caretakers for a couple of weeks, but quit after police arrested Clay while he was getting into Peeples's car. Peeples returned to Chicago, but he did not stay away from the DTO for long. In December 2008, Peeples returned to Rockford and resumed working for Daniels as the head of the runners until his arrest in March 2009. The DTO con-

tinued to operate until Daniels was finally arrested in September 2009.

A federal grand jury indicted fifteen individuals involved in the DTO on charges of conspiring with each other to possess with intent to distribute heroin and crack cocaine. The eight here on appeal each pled guilty. Daniels's sentencing hearing occurred first and set the stage for the other defendants' later hearings.

Representing himself *pro se,* with only the aid of standby counsel, Daniels contested the PSR's drug quantity calculation and the two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a firearm in connection with a drug offense. The district court heard testimony from various witnesses, including ATF Special Agent Daniel Ivancich, who interviewed Daniels after his arrest on September 9, 2009. Ivancich explained that Daniels told agents that the DTO had been "going through a hundred grams of raw heroin a week" and stretching it out to sell 700 grams of heroin mix per week for the past year (*i.e.,* since 2008). Daniels testified on his own behalf and admitted that he may have told agents that he *could* stretch the 100 grams of raw heroin by diluting it seven times to produce 700 grams of heroin mix, yet denied having told them that he had been doing this "for the past year." But the district court heard other evidence that corroborated Agent Ivancich's testimony, and concluded that the DTO distributed 700 grams of heroin per week, or 72.8 kilograms of heroin over the course of the two-year conspiracy. The

court also found that Daniels possessed a firearm as part of the conspiracy after hearing additional testimony from Agent Ivancich and others, and ultimately sentenced him to 520 months' imprisonment.

Each of the other remaining defendants were represented by counsel at their respective sentencing hearings and argued that the DTO distributed a much smaller quantity of drugs. But the district court rejected these arguments, crediting Agent Ivancich's testimony about Daniels's drug quantity admission as the best evidence before the court. The court also applied the two-level sentencing enhancement for possession of a firearm to defendants Block, Townsend, Knox, Clay, and Peeples after finding that the possession of firearms by other members of the conspiracy was reasonably foreseeable and done in furtherance of the conspiracy. Each of the defendants filed timely appeals, which we consolidated.

## II. ANALYSIS

We review a district court's applications of the Sentencing Guidelines de novo and its findings of fact underlying the application of the Guidelines for clear error. *United States v. Johnson*, 227 F.3d 807, 812 (7th Cir. 2000). The majority of the defendants only challenge the district court's finding that the conspiracy sold 700

grams of heroin per week.[1] So we begin with the joint issue regarding drug quantity, and then move on to the separate arguments made by Clay, Cobb, and Peeples.

### A. Drug Quantity Calculation Did Not Constitute Clear Error

A district court's calculation of the quantity of drugs attributable to a defendant is a finding of fact reviewed for clear error. *United States v. Morales*, 655 F.3d 608, 635 (7th Cir. 2011). Such findings of fact are given great deference and overturned only if we are "left with the definite and firm conviction that a mistake has been committed." *Johnson*, 227 F.3d at 813 (citation omitted). District courts are entitled to estimate drug quantity from testimony about the amount of drugs dealt over a specified period of time, but ultimately it is the weight of the consumable mixture (or substance containing the illegal drug), rather than the weight of the illegal drug itself that counts for sentencing purposes. U.S.S.G. § 2D1.1, Application Note 1 (2009); *United States v.*

---

[1] We note at the outset that Knox's and Peeples's appeals on this ground must be dismissed as waived. They both pled guilty and agreed in their plea agreements not to challenge the government's drug quantity determination. *See United States v. Staples*, 202 F.3d 992, 995 (7th Cir. 2000). The government contends that Smith has also waived any appeal of this issue, but we disagree because his plea agreement reserved the right to challenge the drug quantity amount.

*Stewart*, 361 F.3d 373, 377 (7th Cir. 2004). We will not find clear error in a case "where two permissible views of the evidence exist." *United States v. Marty*, 450 F.3d 687, 690 (7th Cir. 2006). This is one of those cases.

To establish the quantity of drugs attributable to the DTO's members, the government relied on three main pieces of evidence at the sentencing hearings. First, Agent Ivancich explained that Daniels told agents that the DTO used "a hundred grams of raw heroin" and mixed "seven additional times" with sleeping pills and other products to ultimately sell 700 grams of diluted heroin per week. Daniels maintained that he never admitted to selling this quantity of drugs since 2008, but also suggested that the court should discount his previous statement to the agents because he "had no intentions on cooperating with them" and was simply telling them what they wanted to hear. The district court did not misunderstand Daniels's testimony as the defendants suggest; it simply did not believe him and for good reason. If anything, it seems more likely that Daniels would have sought to minimize his conduct—not deliberately *inflate* the quantity of drugs being purchased and resold every year—in an effort to be released from custody as soon as possible. *See United States v. Contreras*, 249 F.3d. 595, 602 (7th Cir. 2001) (finding "[n]o one was more qualified than [the defendant] himself to put a number on the amounts of cocaine he was purchasing and re-selling, and [the agent] was simply recounting what [the defendant] told him in this regard"); *United States v. Corral*, 324 F.3d 866, 871-72 (7th Cir. 2003) (col-

lecting cases). In any event, the district court had to make a credibility determination and we are not in a position to second-guess such a determination on appeal. *Johnson*, 227 F.3d at 813; *United States v. Etchin*, 614 F.3d 726, 738 (7th Cir. 2010) (noting that when a sentencing challenge is based on a credibility determination, our review is "especially deferential to the district judge's assessment of the testimony").

But there is more. Tashayla Paige, Daniels's girlfriend, stated in a proffer that DTO members purchased between 50 and 100 grams of raw heroin twice per week. And the government also offered grand jury testimony from a caretaker named Jamel Gregory, who stated that he made trips to Chicago twice a week to obtain 200 grams of raw heroin. This additional evidence suggests that the DTO may have obtained as much as 200 to 400 grams of raw heroin per week to cut and dilute—making the 100 gram estimate the district court attributed to the defendants appear conservative.

Nevertheless, the defendants contend that the district court failed to make a cautious estimate of drug quantity because defendant Clay proposed at sentencing that the DTO did not sell anywhere close to 700 grams of heroin mix per week, but rather sold approximately 250 grams. But the district court noted that Clay's suggested calculation began with the flawed premise that there were only three runners working for the conspiracy at one time, whereas Agent Ivancich credibly testified that there were often between four and six. Moreover, Clay's

estimate was derived in part from other co-conspirators whose statements sometimes conflicted and all of whom had much more limited roles in the conspiracy than Daniels. In reality, the trial court tried its best to evaluate a mountain of conflicting evidence from several different sources. As we have often observed, drug quantity calculations are an art, not a science.[2] *See United States v. Jarrett*, 133 F.3d 519, 530 (7th Cir. 1998) (noting that we afford trial courts "some room for speculation and reasonable estimation" so long as "percentages and quantities were not pulled out of thin air" (citation omitted)). And even if we were to consider the defendants' view of the evidence as a "reasonable alternative" in this case, an alternative view of evidence does not constitute clear error. *See Marty*, 450 F.3d at 690; *Anderson*

---

[2] The defendants argue that the court's drug quantity determination would have given the DTO an extraordinary amount of revenue. If the conspiracy sold 700 grams per week, it would have grossed $70,000 per week in revenue ([700 grams÷2.5 grams per jab]×25 baggies per jab×$10 sale per baggie). Defendants contend that the very idea of a DTO of this size and scope earning to the tune of over $7 million in just over two years is "economically implausible." Maybe. But these sums do not include the DTO's business expenses and some of its profits could have easily been secreted away. *See United States v. Hernandez*, 544 F.3d 743, 750 (7th Cir. 2008) ("We have long recognized that the drug quantity calculation is necessarily imprecise because 'drug dealers ordinarily do not use invoices and bills of lading.'" (quoting *United States v. Rodriguez*, 67 F.3d 1312, 1325 (7th Cir. 1995)).

*v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985).  The defendants further argue that once the district court determined at Daniels's sentencing that the organization distributed 700 grams of heroin per week, it erred by attributing that amount to each of the other members of the conspiracy. We disagree.

The confusion appears to have started at Block's sentencing when the parties attempted to lower Block's base offense level by stipulation. In response, the district court referred to the drug quantity established at Daniels's hearing and stated: "It is my understanding that we're talking about the same conspiracy and that I cannot [under *United States v. Taylor*, 600 F.3d 863 (7th Cir. 2010)] change amounts from one defendant to another. . . . The stipulation asks me to ignore facts and engage in a fiction [regarding drug quantity], and I can't do that." The district court was not bound by the parties' attempt to lower the base offense level for Block in his plea agreement. *See United States v. Barnes*, 602 F.3d 790, 796 (7th Cir. 2010); U.S.S.G. § 6B1.4(d). The commentary to U.S.S.G. § 6B1.4(d) makes clear:

> [T]he court is not obliged to accept the stipulation of the parties. Even though stipulations are expected to be accurate and complete, the court cannot rely exclusively upon stipulations in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information.

Indeed, Block does not argue on appeal that the parties' offense level stipulation in the plea agreement was binding.

The district court's statement could suggest that the judge thought *Taylor* bars *any* reconsideration of drug quantities for defendants subsequently charged in a conspiracy. We do not read *Taylor* quite so broadly. In *Taylor*, the district court sentenced four co-defendants who pled guilty on the basis of a five to fifteen kilogram drug quantity stipulated in their plea agreements. But when two other co-defendants proceeded to trial and were convicted, the trial court found that they should be sentenced according to a forty kilogram drug quantity. 600 F.3d 863. The problem in that case was the district court's failure to explain the discrepancy in the amount of drugs attributable to the various defendants given an identical factual record. We never held that trial courts cannot consider new evidence in sentencing a defendant after making an earlier drug quantity determination for his co-conspirator. *See Barnes*, 602 F.3d at 796-97 (explaining that district courts have "the authority to disregard the factual stipulations in the plea agreements for cooperating defendants if [they feel] that they were not supported by the evidence").

This is not a situation where the defendants who were sentenced after Daniels claimed to have had only a minor role in the conspiracy. Instead, they contend that the district court incorrectly calculated the amount of heroin attributed to the entire conspiracy. But the

court listened at great length to all of the additional
evidence each defendant presented to contest the
quantity of heroin sold by the conspiracy. For instance,
Clay argued that several lab reports from the seizures of
heroin sold by the DTO showed a wide range in drug
purity, which suggested that the DTO did not con-
sistently dilute all of its heroin by "cutting it" seven
times. But the district court did not disregard this
evidence without justification. It simply found it unper-
suasive given other conflicting testimony and declined
to depart from the previously determined drug quantity
amount. Applying its drug quantity calculation consis-
tently among the various defendants was therefore
not clearly erroneous.

### B.  No Error in Refusing to Consider Sentencing Disparities with State Court Defendants

Defendant Clay argues that the district court failed to
consider the sentencing disparities between himself and
other runners who were prosecuted in state court. Ac-
cording to Clay, the runners sentenced in state court
only received sentences between five and seven years,
whereas he was sentenced to 320 months' imprisonment.

The record shows that the district court addressed
Clay's claim of unwarranted sentencing disparities and
rightly rejected it. None of the state court defendants
were convicted of conspiracy, and the state court
appears to have had limited evidence at its disposal in
arriving at the runners' sentences. But more im-

portantly, the government is correct that federal courts need not consider disparities with state court sentences. We explained in *United States v. Schulte* that "[t]he Guidelines have no effect on a state legislature's freedom to impose criminal punishments that differ from the federal government's sanctions for the same conduct. . . . A disparity is not 'unjustified' simply because the federal and relevant state governments impose different punishments on similar conduct." 144 F.3d 1107, 1110-11 (7th Cir. 1998). So this argument fails too.

## C. Cobb's Request for Downward Variance Was Adequately Addressed

The next matter is Cobb's claim that the district court failed to adequately address each of the sentencing factors under 18 U.S.C. § 3553(a). He maintains that the district court specifically failed to consider his personal history and cooperation with law enforcement. This argument does not warrant much discussion.

The district court sentenced Cobb to 245 months' imprisonment, toward the low end of the applicable Guideline range. A sentence within a properly calculated Guideline range is, for purposes of appellate review, presumptively reasonable. *United States v. Robinson*, 435 F.3d 699, 701 (7th Cir. 2006). The district court must give meaningful consideration to the sentencing factors set out in § 3553(a) and explain its sentencing decision, but a district court must only "say enough to allow meaningful appellate review." *United States v. Lua-*

*Guizar*, 656 F.3d 563, 566 (7th Cir. 2011). In other words, the court "need not mention every single factor, so long as we have confidence that the sentencing process was fair." *Id.* (citation omitted). The record here demonstrates that the district court more than satisfied this task. The court carefully analyzed Cobb's arguments for a reduced sentence over six transcript pages before explicitly stating that it had considered each of Cobb's arguments and still declined to reduce his sentence. Cobb may have found this exchange with the court unsatisfactory, but the district court committed no error. *See United States v. Garcia-Oliveros*, 639 F.3d 380, 381 (7th Cir. 2011) ("[A] sentencing court is not required to explain its view on every argument in mitigation or aggravation." (citing *United States v. Miranda*, 505 F.3d 785, 792 (7th Cir. 2007); *United States v. Acosta*, 474 F.3d 999, 1003 (7th Cir. 2007))).

### D. Calculation of Peeples's Firearms Enhancement Was Flawed

The last matter to settle is defendant Peeples's challenge to his sentence. As explained above, Peeples was involved in the DTO for approximately fourteen weeks out of the twenty-seven month conspiracy. On appeal, he objects to the district court's application of a two-level sentencing enhancement under U.S.S.G. § 2D1.1(b)(1) for the possession of firearms by his co-conspirators. We review the district court's factual findings supporting the enhancement for clear error. *United States v. Strode*,

552 F.3d 630, 635 (7th Cir. 2009). It is the government's burden to "establish the appropriateness of the enhancement by a preponderance of the evidence." *Vold*, 66 F.3d at 920. Though it is a close call, we cannot conclude that the two-level enhancement of Peeples's offense level was supported by this record.

Section 2D1.1(b)(1) provides for a two-level enhancement "if a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1). We have repeatedly observed that the enhancement is not only applicable for the defendant who actually possesses a gun in the course of a drug offense, but "section 1B1.3(a)(1)(B) makes clear that defendants can also be on the hook for firearms possessed by their coconspirators so long as such possession was reasonably foreseeable." *United States v. Luster*, 480 F.3d 551, 558 (7th Cir. 2008) and cases cited therein; *see also United States v. Harris*, 230 F.3d 1054, 1057 (7th Cir. 2000). The district court must therefore make two separate findings: (1) "that someone in the conspiracy actually possessed a firearm in furtherance of the conspiracy"; and (2) "that the co-conspirator's firearm possession was reasonably foreseeable to the defendant." *Luster*, 480 F.3d at 558 (citations omitted). If the government meets its burden of showing gun possession by a co-conspirator, then "the burden shifts to the defendant to show that it was clearly improbable that the gun was connected to the offense." *United States v. Olson*, 450 F.3d 655, 684 (7th Cir. 2006) (citing *United States v. Berthiaume*, 233 F.3d 1000, 1004 (7th Cir. 2000)).

Based on the record before it, the district court did not err in concluding that certain DTO members possessed firearms. At sentencing, Peeples argued that the use of firearms was not part of any jointly undertaken criminal activity, but evidence showed that several members of the DTO—including Daniels, Townsend, Knox, and Paige—not only possessed firearms, but did so as part of their conspiracy. The district court specifically pointed to the fact that Daniels told federal agents he would give guns to any member of the DTO who wanted them for protection. Moreover, Paige said that Daniels and other DTO members used guns as a "means of protection" for the organization.

The more difficult question is whether Peeples should have reasonably foreseen his co-conspirators' gun possession as a member of this conspiracy. In tackling this question, the district court first referenced prior cases from our circuit holding that courts are permitted to consider the practical reality of the drug trafficking industry in determining whether the possession of firearms by other members of a conspiracy is reasonably foreseeable to a particular defendant. *See United States v. Berchiolly*, 67 F.3d 634, 640 (7th Cir. 1995) (noting that "the drug industry is by nature dangerous and violent"); *United States v. Vaughn*, 585 F.3d 1024, 1029 (7th Cir. 2009) (recognizing that "guns are tools of the drug trade"). The district court acknowledged, however, that common sense assumptions about the drug trade only go so far and cannot alone satisfy the

foreseeability requirement. *See Vold*, 66 F.3d at 921 ("We have never held . . . that the mere risk involved in a drug manufacturing conspiracy establishes the reasonable foreseeability of a concealed firearm under Guideline § 2D1.1(b)(1) absent other evidence."). The government also concedes that the use of firearms was not reasonably foreseeable to every runner in the DTO and it did not seek the firearm enhancement for Smith given the lack of evidence supporting the enhancement.

But in attempting to fill the gap between what is known about the drug industry generally and the particular circumstances of this case, the district court erroneously relied on several irrelevant facts. For example, the court highlighted the fact that Daniels told agents he purchased guns for other members of the conspiracy to use, but there is no evidence that Peeples ever heard Daniels make a statement even close to this effect. This case is somewhat similar to *United States v. Vold* in this regard. In that case, the government tried to prove that a co-defendant's gun possession was reasonably foreseeable based on certain statements he made to a third party about his willingness to engage in a shoot-out with police, but there was no evidence that the defendant ever heard his co-defendant make those statements. *See* 66 F.3d at 921.

The district court also looked at the fact that Peeples admitted to seeing a rifle at Daniels's home during the time he was a member of the conspiracy. But seeing a gun at someone's home is different than seeing a gun at

a drug stash house. And the government cannot point to any evidence of Peeples seeing drugs at Daniels's home while he was a member of the conspiracy. There is also no evidence in this record to suggest that Daniels's home was the base of the DTO's drug distribution activity. This situation is therefore critically different from other textbook cases we have dealt with in the past where a co-conspirator clearly possessed a firearm at the same location where the defendant saw drugs being stored or distributed. *See, e.g., Luster*, 480 F.3d at 558; *United States v. Artley*, 489 F.3d 813, 823 n.5 (7th Cir. 2007); *United States v. Banks*, 987 F.2d 463, 468 (7th Cir. 1993) (collecting cases).

The district court also stated that Peeples knew that Clay possessed a firearm. But Peeples pointed out in his sentencing memorandum that Clay was arrested while getting into Peeples's car due to allegations from Clay's girlfriend that he threatened her with a gun. That was the only reference to Clay's firearm possession in the record, and it does not establish the reasonable foreseeability of Clay or others using a firearm in their drug business. The court finally stated that Peeples had firsthand knowledge that guns and drugs go hand in hand because of his use of a firearm in connection with a previous conviction from 2003. But Peeples's past dealings with guns in 2003 does not establish the foreseeability of his co-conspirators' conduct in 2008. *See United States v. Noe*, 411 F.3d 878, 889 (8th Cir. 2005) (refusing to take into account guns recovered from defendant's residence in 1999 when conspiracy at issue did not

begin until 2000). We conclude that the district court committed clear error when it enhanced Peeples's sentence for possession of a firearm.

### III. CONCLUSION

For the reasons set forth above, we VACATE Peeples's sentence and REMAND to the district court for resentencing. The sentences of all other defendants are AFFIRMED.