In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2052

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARLYN J. BARNES,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 06 CR 00023—**Theresa L. Springmann**, *Judge.*

ARGUED JANUARY 20, 2010—DECIDED APRIL 8, 2010

Before FLAUM, KANNE, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge.* On May 24, 2006, defendant-appellant, Marlyn Barnes, was indicted, along with Melvin Taylor, Michael Alexander, Theodis Armstead, Herbert Hightower, and Vernell Brown, for conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846. Barnes was also indicted for carrying a firearm during and in relation to a drug trafficking crime, in violation of

18 U.S.C. § 924(c). In February of 2008, a jury found Barnes guilty on both counts. For the purpose of sentencing, the district court found that the conspiracy involved forty kilograms of cocaine, making Barnes's base offense level 34. Barnes appeals the district court's sentence on the grounds that the district court improperly rejected a stipulation by the parties that the conspiracy involved five-to-fifteen kilograms of cocaine, which would have resulted in a base offense level of 32, and that the evidence the district court relied on in rejecting that stipulation was unreliable. For the reasons set forth below, we vacate the district court's sentence and remand for re-sentencing.

## I. Background

This conspiracy involved a fake shipment of drugs traveling from Texas to Fort Wayne, Indiana. Barnes first learned of the fake shipment from Kurt Hunter. Hunter and Barnes had been providing each other with drugs on a regular basis for several months prior to April of 2006. However, Barnes was unaware that Hunter was working as a confidential informant for the government. On April 17, 2006, Hunter and Barnes met to develop a plan to steal a local dealer's stash of drugs. At that meeting, Hunter mentioned the fictional shipment of drugs that became the core of this conspiracy. Barnes became interested in stealing this fictional shipment rather than carrying out the original plan. On April 23, 2006, Hunter introduced Barnes and Alexander, Barnes's brother, to Agent Wayne Lessner, the undercover agent

working with Hunter. Barnes and Alexander believed that Hunter and Agent Lessner were couriers for the drug shipment from Texas. Barnes met with Hunter and Agent Lessner once more that month. Agent Lessner recorded both meetings. Although Barnes, Hunter, and Agent Lessner discussed the logistics of the heist at these meetings, Hunter and Agent Lessner intentionally never indicated the amount of drugs that would be involved in the shipment because drug couriers would not normally know that information.

With little guidance from Hunter and Agent Lessner on the amount of drugs involved, Barnes made various assumptions about the quantity of drugs the group would be stealing. Many of these assumptions were captured on the audiotapes. While discussing how much money they could make from this heist, Barnes said, "Whatever it is, I'll like as far as like a good forty keys. You know what I am saying? Gonna say 40 keys times $18,000." Also, while Barnes was discussing the distribution of drugs among the heist participants, he said, "You give me—you give me twenty keys, and my brothers, man . . . we run this city." At one point, Barnes's expectations grew from somewhere between twenty-to-forty kilograms to eighty kilograms as indicated by his statement, "Once we get this shit, eighty pounds, eighty keys, whatever, you know what I am saying, its y'all shit . . . gonna pay $15,000 for each key to y'all . . . you know what I'm sayin, around 800 G's with 80 keys."

After the second meeting, Hunter and Agent Lessner stayed in contact with Barnes, updating him on the prog-

ress of the fictional drug shipment, while they set up the logistics for the fake heist and the eventual arrest of Barnes and the people working for him. The government arranged for two hotel rooms with surveillance cameras at the Knights Inn in Fort Wayne, Indiana for the nights of May 3 and May 4, 2006. Meanwhile, Barnes was arranging things on his end. At trial, Hightower, who had pleaded guilty and agreed to cooperate with the government, testified that Barnes recruited him into the conspiracy sometime during April of 2006. Hightower also testified that Barnes told him that the plan was to rob fifty kilograms of cocaine from a stash house in Fort Wayne with Melvin Taylor and two individuals Taylor recruited, Vernell Brown and Theodis Armstead.

On May 3, 2006, Barnes, Hightower, and Jessica Pinero, Barnes's girlfriend, traveled from Gary, Indiana to Fort Wayne to meet with Agent Lessner and to carry out the heist. According to Hightower, the three stopped at Taylor's house on the way out of Gary. At Taylor's house, Taylor took a bag out of his car and gave it to Barnes. Barnes then gave the bag to Hightower. Inside the bag, Hightower saw a Keltec automatic rifle and a bullet-proof vest. Hightower took an AK-47 from the car and put it into the bag. On May 4, 2006, in Fort Wayne, Barnes participated in a final planning meeting with Agent Lessner, Hunter, Hightower, Taylor, Alexander, Armstead, and Brown. The government introduced a videotape of this meeting at trial. During the meeting, Agent Lessner discussed the logistics of the heist, but intentionally stopped short of discussing the quantity of drugs in-

volved. At one point Barnes asked, "how many keys is it? Like a hundred?" Agent Lessner reiterated that he did not know the quantity. In response to a question from Alexander wondering if it would be at least twenty keys, Agent Lessner told them that the drugs would be in the fuel tank and described the fuel tank as the size of the dresser in the room. At trial, Hightower testified that Agent Lessner told the group that there would be forty kilograms of cocaine, but this statement was not on the tape and Agent Lessner testified to the contrary.

On the morning of May 5, 2006, Agent Lessner called Barnes to tell him that everything was ready. Barnes took the bag with the bulletproof vests and guns. Barnes and Hightower rode with Agent Lessner in his vehicle to the storage facility to pick up the van that they would use the heist. Taylor, Armstead, and Brown followed in Taylor's car. Once they arrived at the storage facility, the group was arrested.

On September 18, 2007, Barnes, Armstead, Brown, and Taylor proceeded to trial—Alexander and Hightower pleaded guilty prior to September 18, 2007. Early in the trial, Armstead, Brown, and Taylor moved for a mistrial because Barnes agreed to testify on their behalf. The district court granted the mistrial and severed the defendants' trials. Barnes proceeded to trial alone and was found guilty on both counts. Armstead and Brown then pleaded guilty and Taylor proceeded to trial as the only remaining defendant. Barnes testified at Taylor's trial, claiming that Taylor had no knowledge of, or involvement in, the plan to steal the drugs. The jury found Taylor guilty.

All of the defendants who pleaded guilty before trial were sentenced before Barnes, but after both trials. For Armstead, Brown, Alexander, and Hightower, the district court found that the conspiracy involved five-to-fifteen kilograms of cocaine, resulting in a base offense level of 32 for each of those defendants. In the initial Pre-Sentence Report ("PSR") for Barnes, the probation officer recommended a base offense level of 32 based on a quantity of drugs of five-to-fifteen kilograms. The government objected to this drug calculation. Before Barnes could respond to the objection, the probation officer revised the PSR to reflect a drug quantity of forty kilograms. Barnes objected to this drug quantity. After both parties submitted sentencing position papers to the district court, the district court ordered the government to file further briefing to support its position on the amount of drugs involved in the conspiracy. Rather than file supplemental briefs, the government and Barnes discussed the drug quantity issue and stipulated that the quantity was five-to-fifteen kilograms. However, at sentencing, the district court rejected this stipulation and found that the drug quantity was forty kilograms. In rejecting the stipulation, the district court reasoned that the quantity of drugs calculation for Barnes should not be impacted by the fact that Barnes's co-defendants were sentenced based on a factual finding that the conspiracy involved five-to-fifteen kilograms of cocaine. The decision to reject the stipulation increased the base level of the offense from 32 to 34. In its sentencing memorandum, the district court relied on the following pieces of evidence to support its finding of forty kilograms of

cocaine: (1) Agent Lessner's statement in the hotel meeting that the drugs would fill the dresser; (2) Barnes's statement on the audiotape of the meeting with Barnes, Hunter, and Agent Lessner where Barnes discussed the profits based on forty kilograms; (3) Barnes's statement on the audiotapes that he expected his share of the heist to be twenty kilograms; and (4) the testimony of Hightower that he expected to be stealing at least forty kilograms. After considering the applicability of other enhancements, the district court assessed the proper guideline range to be 292 to 365 months. Had the district court found the base level of the offense to be 32, the range would have been 235 to 293 months. At the end of the sentencing hearing, when considering the § 3553(a) factors, the district court considered the discrepancy between Barnes's base offense level and his co-defendants' base offense levels due to the difference in the amount of drugs assessed at the time of sentencing. The district court explicitly noted that there was no reason to treat Barnes differently from his co-defendants with regard to the amount of drugs involved in the conspiracy. Therefore, the district court sentenced Barnes to the low end of the guideline range—292 months. This appeal follows.

## II. Discussion

Barnes argues that the district court erred in determining that the amount of cocaine attributable to the conspiracy was forty kilograms rather than accepting the stipulation that the conspiracy involved five-to-fifteen kilograms of cocaine. We review a district court's factual

findings regarding drug quantity for clear error. *United States v. Clark*, 538 F.3d 803, 812 (7th Cir. 2008). The government has the burden of proving the quantity of drugs attributable to the defendant. *United States v. Krasinski*, 545 F.3d 546, 551 (7th Cir. 2008). The evidence the district court relies on must have "sufficient indicia of reliability to support its probable accuracy." *United States v. Bautista*, 532 F.3d 667, 672 (7th Cir. 2008).

As a preliminary matter, the government argues that this sentence is unreviewable because it falls within the guideline range that would have applied had the district court found a drug quantity of five-to-fifteen kilograms. The government relies on *Emezuo v. United States*, 357 F.3d 703, 710-11 (7th Cir. 2004), to support its position. In *Emezuo*, we held that some sentences should not be reviewed because, "[i]t is reasonable to conclude that the same sentence would have been imposed regardless of which Guideline range applied when the sentencing judge had specifically said as much at the sentencing hearing . . . and when the district court indicated that, if a lower sentencing range had applied, he would have sentenced the defendant to the high end of that range." *Id.* The government relies on the following statement by the district court to suggest that the reasoning from *Emezuo* applies here:

> Barnes is similarly situated with regard to the amount of drugs that were involved in the conspiracy, and his advisory guideline range does not currently take this into account. Thus a sentence at the high end of the advisory guideline range could lead to an

unwarranted sentencing disparity. However, the Court does not find that a variance from the guideline range is warranted. Rather, the Court finds taking into account the parties' stipulation, a sentence at the low end of the guideline range, which is 292 to 365 months of imprisonment is reasonable. This low end of the sentence falls at the high end of the range that using the stipulated amount of drugs would have generated, which would have resulted in a range of 235 to 293 months of imprisonment, while still taking into account the other factors, such as the seriousness of the offense.

Contrary to the government's position, the district court's language "the Court does not find that a variance from the guideline range is warranted," implies that the calculated advisory guideline range did influence the district court's ultimate decision to sentence Barnes to 292 months. Although the district court discussed the overlapping ranges, it did so only in the context of assessing § 3553(a) factors. It did not say that it would have applied the same sentence regardless of which range it started with. Because the district court did not evince a clear and unambiguous intention to give the same sentence even if the lower guideline range applied, we review the sentence.

Before we reach the issue of clear error, we must first decide the legal question of whether a district court may disregard a post-trial factual stipulation between the defendant and the government regarding the amount of

drugs for sentencing purposes.[1] Because of the rarity of this situation, this specific question is a matter of first impression for this court. As discussed in both briefs and the district court's sentencing opinion, there is no question that a district court has the authority to reject a factual stipulation in a plea agreement. *See* U.S.S.G. § 6B1.4(d) ("The court is not bound by the [plea agreement] stipulation, but may, with the aid of the presentence report, determine the facts relevant to sentencing"). There is no similar statutory grant of authority to disregard factual stipulations outside of plea agreements. Barnes contends that this silence means the district court cannot reject a post-trial stipulation of fact. However, this absence of a specific grant of authority does not control the district court's authority on this issue. U.S.S.G. § 6B1.4 deals with stipulations of facts in plea agreements generally and explicitly grants the authority to the parties to provide the district court with stipulated facts. No similar section of the sentencing guidelines exists with regard to post-trial stipulations. Therefore, unless we read this silence to mean that post-trial stipulations of fact are also not authorized under the sentencing

---

[1] The government claims that the district court did properly consider the stipulation when it considered the § 3553(a) factors. This argument is misguided. A district court does not consider § 3553(a) factors until after making a proper guideline range determination. Therefore, the court's consideration of the stipulation in the § 3553(a) factors would not save the sentence if we found the district court's disregard for this stipulation to be improper.

guidelines, we cannot read the absence of an explicit grant of authority to disregard a post-trial stipulation as controlling in this situation either. Instead, we interpret the absence of explicit instruction on how to deal with post-trial stipulations of fact to mean that we should treat post-trial stipulations as we would any other stipulation of fact, and grant the fact-finder the same authority to accept or reject the stipulation.

Generally, stipulations are not binding on the fact-finder. A stipulation is a contract between two parties to agree that a certain fact is true. *Analytical Engineering, Inc. v. Baldwin Filters, Inc.*, 435 F.3d 443 (7th Cir. 2005). As such, standard contract principles apply. A contract between the prosecutor and the defendant cannot bind a third party—the district court judge—without his consent as well. While it is rare for the district court to reject a post-trial stipulation between the parties, it is not a legal error to do so. The district court in this case found that the stipulation was not supported by the evidence from the trial. That factual determination is an issue we review for clear error, as we would review any factual predicate for determining a sentencing range.

Barnes's argument focuses on the fact that his co-defendants who pleaded guilty and were sentenced before him were sentenced based on the finding that the conspiracy only involved five-to-fifteen kilograms of cocaine. At Barnes's sentencing hearing, the district court addressed this argument by stating, "It is not relevant to this drug quantity finding for this defendant that other co-defendants worked out plea agreements with

the government using a lesser amount of drugs." While that statement is technically true, it is relevant that the district court rejected the drug amount stipulation between Barnes and the government but accepted the same factual stipulation between the government and Barnes's co-defendants who pleaded guilty. The different treatment of the stipulations cannot be based solely on the fact that Barnes's co-conspirators, other than Taylor, pleaded guilty prior to trial. Individuals who plead guilty prior to trial receive the benefit of that decision through certain adjustments enumerated in the sentencing guidelines, *see, e.g.*, U.S.S.G. § 3E1.1, and through bargained-for recommendations by the government, not through conflicting factual findings by the district court.

At Barnes's sentencing hearing, the district court rejected the stipulation because it found that the trial records of Barnes and Taylor supported a finding that the conspiracy involved forty kilograms of cocaine, not five-to-fifteen kilograms. At oral argument, the government justified the discrepancy in the amount of drug calculation among the co-defendants by arguing that the government entered into the plea agreements with the cooperating co-defendants before certain evidence came out at the trials of Barnes and Taylor. However, at the sentencings of Alexander, Armstead, Brown, and Hightower, the district court had the same factual record before it as it did at Barnes's sentencing. As discussed above, the district court had the authority to disregard the factual stipulations in the plea agreements for the cooperating defendants if it felt that they were not supported by the evidence. *See* U.S.S.G. § 6B1.4.

However, the district court never questioned the stipulations between the government and Armstead, Alexander, Brown, and Hightower that the conspiracy involved five-to-fifteen kilograms. Then, on the same factual record, the district court rejected an identical stipulation between the government and Barnes without explaining why it was treating the defendants differently with regard to this finding. In fact, when addressing the potential for sentence discrepancy between similarly situated defendants in the § 3553(a) factors analysis, the district court compared Barnes to his co-defendants and stated, "Mr. Barnes is similarly situated with regard to the amount of drugs that were involved in the conspiracy." Such a finding is incongruous with the district court's decisions to accept the factual stipulations in the cases of the cooperating co-defendants and to reject the factual stipulation in this case. Without any justification for why one co-conspirator is responsible for a greater quantity of drugs than his fellow co-conspirators, such a discrepancy in factual findings is clearly erroneous.

## III. Conclusion

For the reasons discussed above, we VACATE the district court's sentence of 292 months, and REMAND for re-sentencing.