In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 09-1079, 09-1276 & 09-1308

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KATRICE ETCHIN, ALBERT M. COLE, and
MAURICE BOWMAN,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Western District of Wisconsin.
Nos. 07-CR-139-C-03, 07-CR-139-C-02 &
07-CR-139-C-01—**Barbara B. Crabb**, *Judge.*

ARGUED SEPTEMBER 16, 2009—DECIDED AUGUST 4, 2010

Before CUDAHY, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* Maurice Bowman, Albert Cole, and Katrice Etchin pleaded guilty to drug crimes after participating in an operation run by Bowman that supplied crack cocaine to street dealers in Madison, Wisconsin. On appeal, Bowman and Etchin challenge the lower court's decision to admit evidence, including 150 grams

of crack, discovered in a search of Etchin's apartment. In addition, all three contest their sentences.

When police officers knocked on Etchin's door, she told them they could not come in without a warrant. The police entered anyway, securing the area to preserve the status quo while another officer applied for a search warrant. It was not until four hours later, with warrant in hand, that the police searched Etchin's apartment and discovered drugs. We do not doubt that the officers' warrantless entry violated the Fourth Amendment, but the Supreme Court has explained that our analysis cannot end there. *Segura v. United States*, 468 U.S. 796 (1984). Probable cause to search Etchin's apartment existed when the officers entered, and so the temporary seizure of Etchin's home did not create any incremental violation of the Constitution, above and beyond the problem with the initial entry. Because the officers' search relied on a later-arriving warrant that was based on information sufficiently unrelated to the initial entry, the evidence discovered in Etchin's apartment was untainted by the officers' illegal behavior. We therefore conclude that the district court properly denied the defendants' motions to suppress and, finding no error in the sentences imposed, we affirm.

# I

For a decade, Bowman distributed crack to a revolving cast of street dealers who sold his product between their stints in jail. Etchin, who had a child with Bowman, allowed Bowman to use her apartment for storage and to

conduct deals. In 2004 Cole joined the team as a cook, responsible for turning Bowman's powder cocaine into crack before it was sold. By 2006 law enforcement officials had taken an interest in Bowman, and they began to interview associates of his who were now behind bars. A break in the case came on the evening of October 2, 2007, when police stopped Terrell Banks, Bowman's new recruit, as he was driving through Madison with his girlfriend. As a result of the stop, Banks and his girlfriend gave the police permission to search their home. A group of officers took Banks's girlfriend back to the apartment where she and Banks lived and discovered more than five grams of crack. Meanwhile, Banks stayed behind and Detective Steve Wegner began to question him in the back of a squad car.

Before Banks learned that police had discovered drugs at his apartment, he told Detective Wegner that he had sold the last of his supply of drugs, and he named "Chico" as the person who had supplied him drugs in the past. As the interview progressed, Banks realized he was in trouble. Perhaps because he was on supervised release at the time, Banks changed his tune and told Detective Wegner everything he knew: he named Bowman as his source and explained that the crack found in his apartment was left over from a batch he purchased from Bowman two days earlier; he admitted that he had gotten crack from Bowman four times in the preceding two months; he described how the transactions took place in Etchin's apartment at 5834 Russett Road in Madison (he did not know her name or the precise address at the time) with both Etchin and Bowman present; and he

explained that Bowman stored drugs in a Crown Royal bag that was hidden with a scale either in Etchin's bathroom or in a cupboard above her kitchen stove.

Detective Wegner drove Banks to Russett Road to verify his story, and Banks pointed out Etchin's apartment. A database check on Bowman returned two warrants, one related to a child support claim filed by Etchin that listed 5834 Russett Road as the address. Detective Wegner also obtained mug shots of Bowman and Etchin, and Banks confirmed that they were his sources. Just before midnight, Detective Wegner orchestrated a phone call between Banks and Bowman in an ultimately unsuccessful attempt to coax Bowman into a meeting. As the investigation progressed, Detective Dorothy Rietzler and another Madison police officer traveled to the Russett Road address to investigate. They confirmed that Etchin lived in the apartment that Banks had identified and relayed that information to Detective Wegner, who concluded that there was enough evidence to apply for a search warrant. As Detective Wegner got to work on a warrant application, Detective Reitzler decided it was best to secure the apartment. She later reported that she heard male and female voices inside Etchin's house and, around 11:30 p.m., she decided to knock on the front door to ask for permission to enter. Etchin appeared at the door and Reitzler identified herself. When Etchin refused her entry without a warrant, Detective Reitzler and other officers hiding nearby ignored Etchin's wishes and forced their way in, telling Etchin that they intended to secure the apartment until a warrant arrived. While there was marijuana lying in

plain view, the officers did not search the home. Instead, they waited while Detective Wegner prepared an affidavit recounting the investigation up to that point. Four hours after the officers had entered Etchin's apartment, a state judge signed a search warrant. At 3:30 a.m., warrant in hand, officers executed the warrant and found 150 grams of crack in a jacket, a digital scale in the cupboard above the kitchen stove, and marijuana in a number of places around Etchin's apartment.

Etchin and Bowman filed motions to suppress the evidence. The district court, adopting a magistrate judge's recommendation, denied the motions. Etchin then pleaded guilty to maintaining a drug house, 21 U.S.C. § 856(a)(2), and Bowman to possessing with the intent to distribute crack cocaine, 21 U.S.C. § 841(a)(1), both preserving their right to appeal the denial of their motions to suppress. Cole, who did not file a motion to suppress, pleaded guilty to the same crime as Etchin. The district court sentenced Bowman and Etchin to terms of 360 and 46 months, at the very bottom of the ranges recommended by the U.S. Sentencing Guidelines. Cole received the statutory maximum 240 months, a term below the range that the guidelines would otherwise have advised. The defendants appealed.

## II

We turn first to Bowman and Etchin's challenge to the denial of their motions to suppress the evidence found in Etchin's apartment. Our review of the district court's legal conclusions is *de novo,* and we use the clear

error standard for its findings of fact. *United States v. Dowthard*, 500 F.3d 567, 568-69 (7th Cir. 2007). At the outset, we note that the government does not dispute the fact that Bowman had an expectation of privacy in Etchin's home, and because we conclude in the end that suppression is not warranted, we too treat Etchin and Bowman as though they have equivalent Fourth Amendment interests in Etchin's apartment.

## A

The sanctity of the home is a central concern of the Fourth Amendment. It is therefore "a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted). But when there is an emergency, in so-called "exigent circumstances," the police may enter and search a home without securing a warrant. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984). The first step in our analysis is to consider whether the initial entry of the officers into Etchin's apartment was in response to exigent circumstances. We conclude that it was not.

Magistrate Judge Crocker found that "it was reasonable and prudent for the police to enter [Etchin's] apartment" in light of "genuine concerns that Banks's cooperation already was known on the streets, and Banks had reached out to Bowman that evening." In Judge Crocker's view, Reitzler's failed effort to get Etchin's consent to search "let the cat out of the bag" (we para-

phrase slightly), which required officers to enter or else risk that evidence would be destroyed. The government has endorsed the position that exigent circumstances supported the officers' entry, relying on our decision in *United States v. Collins*, 510 F.3d 697 (7th Cir. 2007).

In *Collins*, we acknowledged that police are free to approach a home and knock on a door, and we stressed that doing so may sometimes give rise to an emergency that justifies a warrantless entry into the home. 510 F.3d at 700. We realized that there is a risk of the police's "manufacturing" exigent circumstances, in the sense that their presence is what leads to the urgency of the need to enter, but this possibility, like practically everything else in the Fourth Amendment area, must be assessed case-by-case. We continued, "[I]f police hear a crime being committed within a house (and spoilation of evidence is a crime), then they can enter immediately . . . ; if they do not hear a crime (more precisely, if they do not have probable cause to believe a crime is in progress), they have to get a warrant." *Id.* at 701. Police who without a warrant knock on the door of a drug house seeking consent to enter take the risk that permission will be withheld and an emergency will not materialize. Where an occupant turns the police away or asks to see a warrant, the officer cannot, without some other suspicious activity, justify a warrantless entry based solely on the fear that evidence might be destroyed. *United States v. Ellis*, 499 F.3d 686, 692 (7th Cir. 2007). If "[a] mere possibility that evidence will be destroyed" were enough, then "the requirement of a war-

rant would have little meaning in the investigation of drug crimes." *United States v. Salgado*, 807 F.2d 603 (7th Cir. 1986). Our cases reflect the rule that an emergency justifying entry and a search arises only if the officer knocking at the door observes objective evidence that there is an ongoing crime within that must be stopped before it is completed. The sound of someone walking around, for example, or a voice that announces, "The cops are here," is not enough by itself. But other sights and sounds—toilets flushing, a door slammed, people running, an obvious lie by the person answering the door, or efforts to remove contraband from the house—may be evidence that there is an emergency that calls for an immediate, warrantless intrusion. *E.g.*, *United States v. Amaral-Estrada*, 509 F.3d 820, 828-29 (7th Cir. 2007); *United States v. Rivera*, 248 F.3d 677, 680-81 (7th Cir. 2001).

Detective Rietzler did not see or hear anything to suggest that an emergency was taking place inside of Etchin's apartment. The worst that seems to have happened, according to the government, is that Etchin "reacted belligerently" when Detective Rietzler asked permission to enter. Putting aside the question whether a belligerent reaction to police interruption late in the evening reveals anything but the occupant's annoyance at being bothered, Detective Rietzler's own police report squarely contradicts the government's view of the events. Detective Rietzler relates that when she asked for Etchin's consent to enter, "[Etchin] was insistent we could not come into her residence unless we had a warrant." Detective Rietzler then lists as reasons for entering

that she heard a man's voice inside, that she thought the man might be Bowman, and that she feared that evidence might be destroyed. This is too vague to justify a finding that there was an ongoing crime in the house requiring immediate entry. We proceed, therefore, on the basis that Detective Reitzler and others violated the Fourth Amendment when they entered Etchin's apartment without a warrant.

B

The fact that police behaved illegally does not mean that the remedy of excluding evidence is necessarily appropriate. *Herring v. United States*, 129 S. Ct. 695 (2009). In this case, a straight-forward application of *Segura* leads us to two conclusions: first, Detective Reitzler's four-hour occupation of Etchin's apartment did not add anything to the violation of the Fourth Amendment that had already occurred with the entry; and second, the drugs later found were admissible.

1. *The Seizure of Etchin's Apartment. Segura* holds that officers who enter and seize a home to preserve the status quo while waiting for a search warrant do not commit an independently sanctionable violation of the Fourth Amendment as long as they had probable cause at the moment of entry and the seizure is not unreasonably long. 468 U.S. at 798. The Court reasoned that "the home is sacred in Fourth Amendment terms not primarily because of the occupants' *possessory* interests in the premises, but because of their *privacy* interests in the activities that take place within," and so a police

occupation (which infringes on possession) is permitted even when a search (which implicates privacy interests) would be unreasonable. *Id.* at 810. The second of the Court's concerns—duration—is not at issue here, as the seizure here was shorter than the one upheld in *Segura*. We therefore focus exclusively on the question whether the probable cause criterion was satisfied.

Before considering whether Detective Reitzler had probable cause to seize Etchin's home, we must clarify how the Court was using this concept in *Segura.* There, it was looking at the question whether there was probable cause to support a warrant to search the premises; it was not concerned with the question whether there was probable cause to support a finding of exigent circumstances. *Id.* at 810 ("[A]gents had abundant probable cause in advance of their entry to believe that there was a criminal drug operation being carried on in petitioner's apartment.").

A comparison will help to illustrate the distinction. If the police come across evidence of an ongoing violation of the Endangered Species Act committed by a man who has displayed an African cheetah pelt on the wall of his home, see *United States v. Winnie*, 97 F.3d 975 (7th Cir. 1996), officers may have probable cause to support a search warrant and thus a seizure of the premises under *Segura* (that is, they may act to secure the premises and occupants and wait for the warrant before searching), but there is no emergency requiring immediate entry. On the other hand, when police observe from the street an ongoing brawl inside of a home, see *Brigham City*,

*Utah v. Stuart*, 547 U.S. 398 (2006), they have probable cause to believe not only that a crime is in progress but that it must be stopped immediately—*i.e.*, that an exigency justifies entering and searching the home without a warrant. Our concern is with the first of those scenarios.

*Segura* itself drew a clear line between cases involving exigent circumstances and those involving a temporary seizure of premises supported by probable cause. The Court noted that the district court there had found that there were no exigent circumstances. Accepting that finding, the Court expressed its holding in *Segura* as follows:

> [W]here officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

468 U.S. at 798. See also *United States v. Alexander*, 573 F.3d 465, 476 (7th Cir. 2009) (noting that "[t]he presence (or not) of exigent circumstances . . . is beside the point" in a *Segura* analysis). The defendants are thus incorrect insofar as they argue that *Segura* permits the seizure of a home only in an emergency.

Turning to the question whether probable cause existed in this case, we consider first whether Detective Reitzler and the other officers had probable cause to believe that

they would discover evidence of a crime in Etchin's apartment at the moment that they knocked on her door. This would be enough, under *Segura,* to justify the seizure of the apartment, despite the fact that Etchin voiced an objection to their entry. Strictly speaking, the question whether the police presented enough evidence to the state judge who issued the warrant to support probable cause is a separate inquiry.

Probable cause to search a place exists when, based on all of the circumstances, a reasonably prudent person would be persuaded that evidence of a crime will be found there. *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When an informant such as Banks supplies the basis for probable cause we consider, among other things, whether police have corroborated the informant's statements; the degree to which the informant's knowledge is based on firsthand observation; the detail provided; and the interval between the events described and the application for a search warrant. *United States v. Farmer*, 543 F.3d 363, 377 (7th Cir. 2008). This is not a checklist; indeed, anything like that would be inconsistent with the totality-of-circumstances approach that the Supreme Court endorsed in *Gates.* Other facts might prove helpful in a different case, and there is nothing necessarily wrong if one of these common factors is weak or nonexistent. See *United States v. Carson*, 582 F.3d 827, 832 (7th Cir. 2009). Normally, we give little weight to conclusory statements of an unknown informant, but in some cases even those statements may contribute to the mix, if there is supporting factual information or we are given some other

reason to believe that the informant's statements are reliable. *United States v. Koerth*, 312 F.3d 862, 867-68 (7th Cir. 2002).

Detective Wegner swore that he believed the information he obtained from Banks was "truthful and reliable in that it was obtained against his penal interests." The defendants contest this characterization, saying that Banks was acting in his own interest when he turned on them. The truth probably lies somewhere in the middle. Banks admitted that he bought significant quantities of crack from Bowman on several occasions, but most of his conversation with Detective Wegner focused on the bad acts of Bowman and Etchin and not his own misdeeds. The degree to which Banks was speaking against his own penal interest is debatable, and thus this may not be the best reason to credit his statements.

But even if we had a stronger reason to doubt Banks's motives, probable cause rests on the totality of circumstances, and Banks's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case." *Gates*, 462 U.S. at 234. Banks told police that Bowman and Etchin had a child; he knew that Bowman stored crack in a Crown Royal bag at Etchin's house and kept a scale inside the kitchen cupboard; and he described four visits to the apartment during which he bought drugs. The most recent purchase had taken place just a couple of days earlier. In addition, police corroborated Banks's story by having Banks point out Etchin's house from their

cruiser, having him identify photos, determining that Etchin actually lived in the apartment, and verifying that Bowman was wanted on a warrant for support payments related to the child he had with Etchin. Contrary to the defendants' suggestion, Banks's arranged call to Bowman increased the reliability of his story by establishing that the two knew one another, even if Banks was ultimately unable to set up a drug deal. Though Banks initially lied to the police and had a lengthy criminal record, the information he provided before the officer's entry supplied probable cause to believe drugs would be found in Etchin's house. Accordingly, the seizure of Etchin's home did not violate the Fourth Amendment, and the search warrant was also supported by probable cause.

2. *The Search of Etchin's Apartment*. With that established, we are ready to consider whether the evidence discovered when the officers executed the warrant must be excluded as illegal "fruit" of their initial unlawful entry. *Segura* helps here, too. It holds that when a later-arriving warrant is based on information "wholly unconnected" to the illegal entry, evidence discovered during the search is admissible because its discovery is based on an independent source. *Segura*, 468 U.S. at 813-16; see also *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920). The Supreme Court has used this "wholly unconnected" language repeatedly. *E.g., Hudson v. Michigan*, 547 U.S. 586, 600 (2006); *Murray v. United States*, 487 U.S. 533, 535 (1988). Although the language sounds broad, we have not read it as an inflexible rule that *any* information (no matter how trivial) obtained during an illegal entry

and included in a warrant application taints the subsequent search. *United States v. Markling*, 7 F.3d 1309, 1315-18 (7th Cir. 1993). Such a holding would be inconsistent with the related "inevitable discovery doctrine." See *United States v. Tejada*, 524 F.3d 809, 812-13 (7th Cir. 2008). *Segura* instead focused on the fact that "[n]o information obtained during the initial entry or occupation of the apartment was *needed or used* by the agents to secure the warrant." 468 U.S. at 814 (emphasis added). This suggests two lines of inquiry: first, we ask whether any illegally obtained information affected the judicial officer's decision to issue a warrant, *cf. Franks v. Delaware*, 438 U.S. 154, 171-72 (1978); and second, we consider whether the police officers' decision to seek a warrant was prompted by anything that was discovered during the illegal entry, *Markling*, 7 F.3d at 1315-16.

The inquiry is fact-specific. In the case before us, the record strongly supports the district court's conclusion that "agents always intended to obtain a warrant" and "the warrant would have issued even in the absence of information gleaned from the entry into Etchin's apartment." Investigators had long focused on Bowman. Their questioning of Banks on the evening of October 2, 2007, led them to believe that Etchin's apartment was a place where at least some of Bowman's illegal activities were taking place. Detective Reitzler reported that once she verified that Etchin lived in the place that Banks identified, Detective Wegner concluded there was enough information for a warrant, and he set to work on an affidavit. It is difficult to see how marijuana or anything else in plain sight inside of Etchin's apartment was

necessary to confirm the officers' view that they had indeed found the right place. The fact that Detective Reitzler thought she might get Etchin's permission to enter while Detective Wegner worked on his warrant application does not cast any doubt on Detective Wegner's earlier-expressed intent to secure a warrant.

In addition, the information that was obtained in the illegal entry and then mentioned in Detective Wegner's affidavit was not necessary to the determination that probable cause supported the warrant. The single paragraph of Detective Wegner's affidavit that could be seen as problematic explains that Etchin refused to consent to a search of her home, that officers entered "to prevent the destruction of evidence," that there were several children in the house, that Etchin confirmed one child was Bowman's, and that "[o]fficers found the apartment layout to be the same as [Banks] had described." The bulk of the affidavit recounts information provided by Banks, which we have already described, explaining Bowman's activities and the possibility that crack cocaine would be found in the house. That the layout of the apartment's interior happened to support Banks's story was not an essential factor in the probable cause analysis, particularly when one considers the other efforts to corroborate the information that Banks provided. See *Brock v. United States*, 573 F.3d 497, 502 (7th Cir. 2009) ("The heart of [the] question is whether, taking away any illegally obtained information, the affidavit still demonstrated probable cause."). We would have a much different case if, for example, Detective Wegner's affidavit revealed that Detective Reitzler observed marijuana in plain view. But that infor-

mation was correctly excluded from the warrant affidavit and the probable cause analysis. Accordingly, the link between the initial entry and the later-discovered evidence "was sufficiently attenuated to dissipate the taint" of the illegal search, *Segura*, 468 U.S. at 815, and we conclude that evidence discovered was admissible.

It follows from this conclusion that the marijuana observed at the time of the illegal entry was also properly admitted. See *Murray*, 487 U.S. at 537-41; *Salgado*, 807 F.2d at 608. Given our conclusion that the evidence is admissible under *Segura*, we have no need to reach the government's alternative arguments that the police relied in good faith on a facially valid warrant, *United States v. Leon*, 468 U.S. 897 (1984), and that exclusion would be a disproportionate remedy, *Herring*, 129 S. Ct. at 695.

### III

We turn now to three challenges that the defendants present to their sentences. None gets off the ground.

### A

Bowman and Cole argue that their sentences were based on exaggerated drug quantities. Following a two-day sentencing hearing, the district judge determined that Bowman was responsible for more than 4.5 kilograms of crack and that Cole was responsible for just over two kilograms. We review these findings for clear error. *United*

*States v. Barnes*, 602 F.3d 790 (7th Cir. 2010). Bowman and Cole argue that these quantities are based entirely on the testimony of unreliable government witnesses. They point out that the witnesses were to receive lower sentences for testimony favorable to the government, and so they had a motive to lie about their past dealings with Bowman and Cole. A drug-quantity finding at sentencing must be supported by information that possesses sufficient indicia of reliability, *United States v. Johnson*, 227 F.3d 807, 813 (7th Cir. 2000), and a guidelines range based on false evidence can certainly constitute clear error, *United States v. Salinas*, 365 F.3d 582, 586-87 (7th Cir. 2004). But where a sentencing challenge boils down to a credibility decision, as this one does, our review is especially deferential to the district judge's assessment of the testimony. *United States v. Acosta*, 534 F.3d 574, 584 (7th Cir. 2008); *United States v. House,* 110 F.3d 1281, 1285-86 (7th Cir. 1997).

In 2006, when investigators began to ask questions about Bowman of various people who themselves had been arrested, several volunteered statements that were used to calculate drug quantities included in the defendants' Presentence Investigation Reports ("PSR"). Four of these witnesses—Demonterryo Black, Timothy Hampton, Joseph Thigpen, and James Wilder—agreed to testify against Bowman and Cole at sentencing about their activities in the preceding decade. Hampton said he bought an average of 63 grams of crack per week from Bowman over a two-year period, and he testified that he traveled with Bowman to Chicago to buy drugs dozens of times. Black added that he worked with

Bowman to unload 100 to 250 grams per week for a period of time, and Thigpen explained that he and Bowman pooled money to buy between six and 10 kilograms of powder cocaine, which they turned into crack. All four witnesses confirmed that Cole cooked Bowman's crack, and all said they had seen Cole in action. During cross-examination, Bowman and Cole highlighted the witnesses' lengthy criminal records, their past gang activities, and the personal gain each sought by testifying. Bowman and Cole also called three witnesses of their own who all denied that they had ever seen Bowman and Cole involved with drugs. Finally, Bowman took the stand to contest nearly everything the government witnesses said.

Recognizing that the government witnesses had "very strong reasons to say what they do," the district court nonetheless found their testimony credible. The judge observed that they made "good sense" and corroborated one another. Meanwhile, the judge thought that Bowman's story was "so implausible that it border[ed] on being contemptuous." Bowman and Cole have offered no reason to doubt this credibility determination. While witnesses' motives are important, we have stressed that their reasons for taking the stand "'do not render their testimony inherently unreliable.'" *House*, 110 F.3d at 1285 (quoting *United States v. Garcia*, 66 F.3d 581, 587 (7th Cir. 1995)). Nor is it a requirement that a biased witness's testimony be corroborated by other evidence, *United States v. Mendoza*, 576 F.3d 711, 718 (7th Cir. 2009), though in this case the district court reasonably concluded that the government witnesses corroborated one another.

Finally, the fact that Black, Hampton, Thigpen, and Wilder were unsavory characters is of no importance at this stage.

The district court's conservative conclusions that Bowman distributed "well in excess of 4.5 kilograms" over 15 years and that Cole's limited role meant he was responsible for less than half that amount were supported by a consistent narrative delivered by four separate witnesses who had detailed knowledge of the defendants' activities. The district court was entitled to credit that testimony, and its drug-quantity findings were well-supported.

B

Bowman and Cole also contest the district court's decision to deny them offense-level reductions under U.S.S.G. § 3E1.1, which provides a break to a defendant who "clearly demonstrates acceptance of responsibility for his offense." Again, the district judge is in the best position "to assess whether a defendant is motivated by genuine acceptance of responsibility," *United States v. Gilbertson*, 435 F.3d 790, 799 (7th Cir. 2006), and our review is only for clear error, *United States v. Panice*, 598 F.3d 426, 435 (7th Cir. 2010). The defendants take the position that because they had a right to require the government to prove relevant conduct at sentencing, it is error to deny them a reduction for acceptance of responsibility simply because they exercised that right.

But that argument does not do the district court's decision justice. We recognize that the decision to

demand proof of relevant conduct does not automatically bar the reduction that Bowman and Cole seek. Indeed, a defendant may in a rare case exercise all of her trial rights and still benefit under § 3E1.1. See *United States v. DeLeon*, 603 F.3d 397, 407 (7th Cir. 2010) (discussing Application Note 2 to § 3E1.1). The question is what did the defendant do with that opportunity to testify, or otherwise to participate. Application Note 1(a) to § 3E1.1 tells judges to consider whether a defendant has "*falsely* den[ied] any additional relevant conduct" when deciding whether to grant a reduction for acceptance of responsibility. (Emphasis added.) While a defendant may want cross-examination of witnesses to disprove false testimony related to relevant conduct, she may also try to present testimony in an attempt falsely to deny past activities. Bowman and Cole did the latter, not the former.

The district court decided that Bowman gave "false testimony" and said that Cole "frivolously denied the amounts of crack cocaine attributed to [him]." Cole argues that he is responsible for roughly 10 percent of the quantity of crack cocaine that the government attributes to him. He insists before this court that the government's witnesses made up facts about him, but he presented only one witness to contest their version of events at sentencing. Given the deferential standard of review that applies, we cannot say the district court's conclusion that Cole frivolously denied relevant conduct was clear error. Bowman's argument for acceptance of responsibility would fail under any standard of review. Fatal to his case is the fact that, after he was arrested on

an unrelated warrant on October 2, 2007, he escaped from prison and remained on the lam until early 2008. See § 3E1.1, cmt. n.1(c) (noting the importance of "voluntary surrender to authorities promptly after commission of the offense"). It is worth noting, too, that Bowman is not contesting on appeal the district court's decision to enhance his sentence under § 3C1.1 for obstructing justice. "[A] defendant whose sentence was properly enhanced for obstruction of justice is presumed not to have accepted responsibility." *United States v. Gonzalez-Mendoza*, 584 F.3d at 726, 730-31 (7th Cir. 2009); see also § 3E1.1, cmt. n.4.

## C

We arrive finally at the defendants' arguments that their sentences were unreasonable in light of the well-known feature of the guidelines drawing a distinction between crack and powder cocaine sentences. Where the guidelines have been properly applied, we evaluate the reasonableness of a sentence under an abuse of discretion standard, and we may presume a sentence falling within the guidelines range is reasonable. *Gall v. United States*, 552 U.S. 38, 56 (2007); *Rita v. United States*, 551 U.S. 338, 347 (2007).

All three defendants suggest that the crack/powder disparity is the very definition of an "unwarranted sentence disparit[y]," as the phrase is used in 18 U.S.C. § 3553(a)(6). Under this theory, all sentences imposed pursuant to the guidelines's crack cocaine provisions would be "*per se* unreasonable." The Court has made clear

that a judge may depart from the crack cocaine guidelines because of a policy disagreement with the crack/powder disparity. *Kimbrough v. United States*, 551 U.S. 85 (2007); *Spears v. United States*, 129 S. Ct. 840 (2009). At the same time, however, a district court "is equally within its authority to adhere to the Guidelines because it concurs with the policy judgment the Guidelines reflect." *United States v. Scott*, 555 F.3d 605, 610 (7th Cir. 2009). We have little to add here to the comprehensive discussion of this issue in *United States v. Gonzalez,* 608 F.3d 1001, 1003-05 (7th Cir. 2010). Because *Kimbrough* permits district courts to deviate from the crack cocaine guidelines but does not require them to do so, we reject the defendants' argument that their sentences are unreasonable *per se*.

Etchin develops her argument a bit further, submitting that the district judge failed to pay proper attention to her argument that a downward departure was warranted (even if not required) due to the crack/powder disparity. As with any serious argument at sentencing, we require the sentencing court to consider the point and provide an explanation of its decision that is detailed enough to permit meaningful appellate review. *E.g., Scott*, 555 F.3d at 608-09; *United States v. Harris*, 567 F.3d 846, 854-55 (7th Cir. 2009); *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005).

In Etchin's PSR, the Probation Officer took the position that a departure from the calculated guidelines range was not warranted. Etchin objected, arguing that the crack/powder disparity was a good reason to deviate. In response, the Probation Officer amended the PSR,

writing, "Pursuant to the decision in *Kimbrough* . . . the [district court] is permitted to consider the disparity between powder cocaine and crack cocaine." At sentencing, the district judge noted that Etchin had filed objections to the PSR and said, "One is to the guidelines for determining base offense levels for crack cocaine users." The court continued, "[A]s to the objection to the crack cocaine, I will just note that and proceed. Do you want to say anything further about it?" Etchin's lawyer responded, "On that, probably briefly, Judge." After that, however, there was no further discussion of the crack/powder disparity. At the hearing's conclusion, the judge said, "I will take into consideration the advisory sentencing guidelines . . . . I have noted that both parties have filed objections . . . . Given the nature of the offense and your history and characteristics, I'm persuaded that a sentence within the guidelines range is warranted." Sent. Tr. at 19-20. Although this was on the brief end of the spectrum, the record as a whole provides enough information to permit us to conclude that the judge was aware of her discretion and properly took *Kimbrough* into account.

* * *

We AFFIRM the judgments of the district court with respect to all three defendants.