In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 18-1335

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PAUL HUSKISSON,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:16CR00048-001 — **Sarah Evans Barker,** *Judge.*

———————————

ARGUED JANUARY 14, 2019 — DECIDED JUNE 5, 2019

———————————

Before WOOD, *Chief Judge*, and BRENNAN and ST. EVE, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Paul Huskisson appeals his conviction for possession with intent to distribute methamphetamine. He argues government agents illegally obtained the drug evidence used to convict him when they raided his house without a warrant and saw drugs in his kitchen. The government concedes the illegal entry, but counters that a later-issued search warrant rendered the drug evidence

admissible. We consider whether after the illegal entry the exclusionary rule applies to the methamphetamine found in Huskisson's house.

## I. Background

### A. The Search and Seizure

On February 5, 2016, Drug Enforcement Administration (DEA) agents arrested Anthony Hardy on drug conspiracy charges and related offenses. Seeking to cut a deal, Hardy immediately admitted his role in the conspiracy, led DEA agents to his drugs and guns, and rolled over on two local drug dealers. One of those dealers was Paul Huskisson. Huskisson was previously unknown to the Indianapolis DEA task force, but Hardy provided plenty of intelligence on his dealings with Huskisson, including that:

- Hardy purchased varying quantities of methamphetamine from Huskisson six times over the preceding five months, for $8,000 per pound.
- Hardy bought methamphetamine both at Huskisson's house and at a car lot Huskisson owned.
- Huskisson told Hardy that Huskisson's source expected a shipment of ten to twelve pounds of methamphetamine the next day, February 6. Hardy believed he could buy some or all of that methamphetamine from Huskisson.

As further proof of Huskisson's involvement in the drug conspiracy, Hardy called Huskisson that day. DEA agents, including Special Agent Michael Cline, listened to and recorded

that conversation with Hardy's consent. On the call, Huskisson agreed to deliver ten to twelve pounds of methamphetamine to Hardy.[1]

The next day, Hardy and Huskisson arranged the details of the transaction through a series of telephone calls (again, recorded by the DEA with Hardy's consent). In all, Cline listened in on nine phone calls between the two. Huskisson and Hardy agreed the drug deal would occur at Huskisson's home that night. At that point, the DEA agents did not apply for a search warrant, believing they needed to corroborate that there was methamphetamine at Huskisson's residence before filing the application.

Hardy stayed with Cline until around 5:30 p.m., when Hardy left for Huskisson's house. Cline tailed Hardy's car until it arrived at Huskisson's house about ten minutes later. Cline waited in his car and watched Hardy enter the house, with an entry team on standby. This entry team comprised DEA agents and local law enforcement, including Indiana State Police detective Noel Kinney.

At 6:15 p.m., Cline saw a car pull into the house's driveway. Two men (later identified as Jezzar Terrazas-Zamarron and Fredi Aragon) got out of the car with a cooler, approached the house, and entered. Ten minutes later, Hardy

---

[1] Hardy asked Huskisson, "You got any?" Huskisson replied, "I guarantee you it will be here tomorrow… I talked to the dude." Hardy then asked, "We doing the ten or the twelve?" and Huskisson replied, "It'll be either the ten or the twelve." Hardy later explained to the DEA agents that the "ten or the twelve" referred to ten or twelve pounds of methamphetamine arriving from Huskisson's source the next day.

walked outside and gave a prearranged signal to indicate he had seen methamphetamine in the house.

Once Hardy gave the signal, Cline ordered the entry team to enter Huskisson's house and secure the scene. At the time, no search warrant had been issued. The entry team entered the house and arrested Terrazas, Aragon, and Huskisson, who refused to consent to a search of his residence. Upon entry, officers saw in plain sight in the kitchen an open cooler with ten saran-wrapped packages of a substance which field tested positive for methamphetamine. The three men were taken into custody. Meanwhile, Cline remained outside, pretending to arrest Hardy to disguise his role as an informant. Cline then left with Hardy to prepare applications for search warrants for Huskisson's house and his workplace.

Later that night, DEA agents filed the warrant application for Huskisson's house. The application detailed Hardy's history of drug deals with Huskisson, as well as the many phone calls between Hardy and Huskisson in the last twenty-four hours. The application also included Hardy's description of what transpired while he was inside Huskisson's house: when Hardy arrived, Huskisson called his suppliers and told Hardy they would arrive shortly. Two minutes later, Terrazas came to the door and explained he had five pounds of methamphetamine, only half of what Huskisson had expected. After speaking with Huskisson, Terrazas placed a phone call and Aragon walked in with a cooler. Aragon took ten saran-wrapped packages out of the cooler that appeared to Hardy to be methamphetamine. Hardy then went outside to signal Cline.

In addition to this information, the warrant application contained the following two sentences that underlie this appeal: "The law enforcement officers observed an open cooler with ten saran wrapped packages that contained suspected methamphetamine. The suspected methamphetamine later field tested positive for the presence of methamphetamine." The magistrate judge issued a search warrant for Huskisson's house around 10:30 p.m. the night of Huskisson's arrest, about four hours after the initial entry.

### B. District Court Proceedings

Huskisson was indicted for possessing with the intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Before trial, Huskisson moved to suppress the methamphetamine evidence, arguing it was found after the DEA entry team entered his house without a warrant and without any exigent circumstances, and that DEA agents had included tainted evidence from the illegal search in their warrant application. The district court held a suppression hearing. Cline was unavailable to testify, so Detective Kinney took the stand instead.

On the topic of the warrant application, Kinney testified inconsistently, contradicting himself and other government evidence. At first, he testified the task force's plan was to apply for a warrant if Huskisson refused consent to search, regardless of whether they saw any evidence of drug activity within the house:

> **KINNEY:** Depending on the conversation with
> Mr. Huskisson, if he granted consent to search,
> we would continue the search of the residence.

>   If he didn't, we would secure the residence and
>   obtain a search warrant.

But later Kinney suggested the plan was to apply for a warrant only if the entry team found methamphetamine in Huskisson's home and Huskisson refused consent to search:

> **DEFENSE COUNSEL:** And that after entering and securing that residence, you were going to ask for consent to search from Mr. Huskisson?
>
> **KINNEY:** Yes, should we find the methamphetamine, gather a consent to search. If it was not granted, obtain a search warrant.
>
> **DEFENSE COUNSEL:** Okay. So if you didn't get consent, you were going to start the process for obtaining a warrant?
>
> **KINNEY:** Yes.
>
> **DEFENSE COUNSEL:** So no part of the plan was to start the process for obtaining a warrant prior to entry into the [Huskisson] residence?
>
> **KINNEY:** That's correct, yes.

The district court denied Huskisson's motion to suppress, finding Kinney's first statement to be more accurate and more consistent with the other evidence presented by the government. The district court found Cline "planned to and would have sought a search warrant regardless of the discovery of the methamphetamine packages," and that the warrant appli-

cation was sufficient to establish probable cause "even without those references [to the methamphetamine seized after the illegal entry]." Order Den. Mot. to Suppress at 9–10, ECF No. 76.

The case went to a two-day jury trial, during which three DEA agents, including Cline, testified about their plan to apply for a search warrant. All three testified the entry was intended only to "secure the residence while the search warrants were getting prepared and approved," and that the entry team "waited for the search warrant to be signed" after entry. None of the other agents suggested they intended to apply for a warrant only if methamphetamine was found. The jury found Huskisson guilty and the district court imposed a twenty-year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A)(viii). This appeal followed.

## II. Discussion

Huskisson challenges the denial of his motion to suppress on two grounds: that the warrantless entry violated the Fourth Amendment, and that the search warrant does not satisfy the independent source doctrine. There is no dispute that law enforcement entered Huskisson's house illegally: entering a home without a warrant is directly proscribed by the language of the Fourth Amendment, which guarantees "[t]he right of the people to be secure in their … houses … against unreasonable searches and seizures … ." Evidence from the ensuing search may still be admissible, however, if the independent source doctrine applies. On appeal, we review the district court's findings of fact for clear error and its legal rulings de novo. *United States v. Etchin*, 614 F.3d 726, 733 (7th Cir. 2010). We review de novo a district court's determination that

probable cause supported the issuance of a search warrant. *United States v. Mullins*, 803 F.3d 858, 861 (7th Cir. 2015).

As a general matter, the exclusionary rule prohibits introduction of evidence that the police obtained illegally. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). But this rule has exceptions. Relevant here is the independent source doctrine, which holds that illegally obtained evidence is admissible if the government also obtains that evidence via an independent legal source, like a warrant. *See Murray v. United States*, 487 U.S. 533, 542 (1988) (allowing the admission of evidence found in plain sight during an illegal entry that was later obtained legally); *Segura v. United States*, 468 U.S. 796, 814 (1984) (allowing the admission of evidence found in a home that was first entered illegally, but later entered based on a search warrant "wholly unconnected" to the initial, illegal entry). The independent source doctrine recognizes that the goal of the exclusionary rule is to put "the police in the same, not a worse, position than they would have been in if no police error had occurred." *Nix v. Williams*, 467 U.S. 431, 443 (1984); *see also Murray*, 487 U.S. at 537.

The government urges us to apply the independent source doctrine here, arguing that the warrant obtained after the illegal entry was an independent legal source of the methamphetamine evidence. Huskisson disagrees, arguing that the warrant application referenced the illegally obtained evidence, so it could not be a legal source.[2] Under *Murray*, to decide whether the warrant is an independent legal source, we

_____

[2] To this point, Huskisson also argues that the independent source doctrine should not apply at all in cases of flagrant police misconduct, such as entering a home without a warrant. *See United States v. Madrid*, 152

ask two questions: first, did the illegally obtained evidence affect the magistrate's decision to issue the warrant? And second, did the illegally obtained evidence affect the government's decision to apply for the warrant? *Murray*, 487 U.S. at 542; *see also United States v. Markling*, 7 F.3d 1309, 1315–16 (7th Cir. 1993); *Etchin*, 614 F.3d at 736–38.

On the first question, we have addressed the effect of tainted evidence on warrant applications in two cases relevant here: *United States v. Markling* and *United States v. Etchin*. In *Markling*, while the defendant stayed at a motel, its management decided to move his belongings to another room. Police intercepted the motel staff in transit, illegally searched his briefcase in the motel hallway, found drug paraphernalia inside, and referenced that discovery in the warrant application to search his motel room. *Markling*, 7 F.3d at 1311.

We applied the independent source exception from *Murray* in *Markling*. To determine whether the magistrate judge's decision to issue the warrant was affected by the mention of the illegal evidence, we asked whether, "even without the [illegal evidence], [the] warrant application established probable cause to search Markling's hotel room." 7 F.3d at 1316. We

---

F.3d 1034, 1041 (8th Cir. 1998) (adding a narrow exception to the independent source doctrine when "police officers exploit their presence in the home"). But as we explain below, our circuit applies the independent source doctrine to all cases where the warrant passes the Supreme Court's test in *Murray*. Our precedent therefore bars us from applying the "flagrant misconduct standard" of *Madrid*, a standard that the Eighth Circuit itself has limited to narrow circumstances of egregious police misconduct. *See, e.g.*, *United States v. Swope*, 542 F.3d 609, 616–17 (8th Cir. 2008) (applying independent source doctrine even though the warrant application contained illegally obtained information).

based this approach on other circuits' precedent and the Supreme Court's reasoning in *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* held that when deliberately or recklessly false information is included in a warrant application, "the warrant is still valid if the other information in the application, standing alone, is sufficient to establish probable cause." *Markling*, 7 F.3d at 1316 (citing *Franks*, 438 U.S. at 171–72). We concluded that the same reasoning applied to cases where illegally obtained evidence is included in the warrant application:

> If we may uphold a warrant based on an application including knowingly false information if the other information in the application establishes probable cause, it is logical to conclude that we may uphold a warrant based on an application including illegally obtained information under the same circumstances.

*Markling*, 7 F.3d at 1316.

In the second relevant case, *Etchin*, police illegally entered the defendant's apartment, then applied for a search warrant and mentioned evidence obtained during the illegal entry in the warrant application. *Etchin*, 614 F.3d at 737. The tainted evidence referenced was largely immaterial: for example, the warrant application included the layout of Etchin's apartment seen during the illegal entry, but did not mention the marijuana the officers saw in plain view during that entry. *Id.* at 737-38. Despite the intrusion upon the sanctity of the home, which "is sacred in Fourth Amendment terms," *Segura*, 468 U.S. at 810, we held the warrant was still an independent source, because the tainted evidence included "was not an essential factor in the probable cause analysis." *Etchin*, 614 F.3d at 737. Thus, "the link between the initial entry and the later-

discovered evidence was 'sufficiently attenuated to dissipate the taint' of the illegal search … ." *Id.* at 738 (quoting *Segura*, 468 U.S. at 815). We did not comment in *Etchin* on what the outcome would have been had the warrant application mentioned the marijuana in plain view.

This case presents factual elements similar to those in *Markling* and *Etchin*. Here, the DEA entry team violated the sanctity of Huskisson's home by entering without a warrant, which "is a central concern of the Fourth Amendment." *Etchin*, 614 F.3d at 733. Then, as in *Markling*, the government included the methamphetamine evidence they found in the search warrant application, evidence that was highly probative of probable cause.

With *Murray* as our direction, we apply the *Franks*-style analysis adopted in *Markling*, because doing otherwise would put the government in a worse place than they would have been absent the illegal search. *See Murray*, 487 U.S. at 541 ("Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one."). We thus agree with several other circuits that, to determine whether the inclusion of tainted evidence in the warrant application affected the magistrate's decision to issue a search warrant, we evaluate whether the warrant application contained sufficient evidence of probable cause without the references to tainted evidence, even when that tainted evidence was recovered from an illegal entry into a home. *See Markling*, 7 F.3d at 1316; *see also United States v. Dessesaure*, 429 F.3d 359 (1st Cir. 2005) (affirming the admissibility of drug evidence found during an illegal search of a home that was mentioned in the warrant application); *United States v. Jenkins*, 396 F.3d 751 (6th Cir.

2005) (affirming the admissibility of drug evidence found during an illegal search of a hotel room, even when it was orally mentioned to the magistrate judge at the warrant application hearing); *United States v. Herrold*, 962 F.2d 1131 (3d Cir. 1992) (affirming the admissibility of drug evidence found during an illegal search of defendant's mobile home that was included in the warrant application).

With this legal standard in mind, we return to the facts before us to evaluate probable cause. In the district court, Huskisson did not dispute the warrant application submitted to the magistrate judge contained enough information to establish probable cause "to believe that [the entry team] would discover evidence of a crime [inside] at the moment that they knocked on [his] door." *Etchin*, 614 F.3d at 735.[3] Even if he had, the search warrant application contained plenty of untainted evidence of probable cause. It detailed Hardy's initial admissions to agent Cline about his drug-dealing history with Huskisson, Hardy's nine phone calls with Huskisson, Hardy's signal to Cline, and Hardy's account of what he saw in Huskisson's house after he arrived. Presented with that amount and nature of evidence, the magistrate judge would have issued the search warrant even without the discussion of the field-tested methamphetamine. *Cf. Dessesaure*, 429 F.3d at 368–69.

That settled, we address the second question of *Murray*: did the DEA's illegal entry and field test affect the govern-

---

[3] Huskisson admitted probable cause at the suppression hearing. *See* Supp. Tr. at 66–67, ECF No. 207 ("There was probable cause, but I don't believe that justified the entry … .").

ment's decision to apply for the warrant? On this point, De-
tective Kinney gave conflicting testimony. Initially, Kinney
testified the DEA task force planned to apply for a warrant
regardless of finding methamphetamine during the illegal en-
try; the only variable was whether Huskisson would give his
consent to a search. Later, Kinney testified the plan was to
apply for a warrant only if methamphetamine was found and
Huskisson refused to give his consent to a search. If the latter
is correct, the search warrant would fail under *Murray* be-
cause the illegally obtained evidence would have affected law
enforcement's decision to apply for a warrant and the meth-
amphetamine would be inadmissible. Huskisson urges us to
reconsider the district court's resolution of this conflicting tes-
timony and to credit Kinney's latter interpretation of events.

We disturb a district court's factual determinations only
for clear error. *United States v. Terry*, 915 F.3d 1141, 1144 (7th
Cir. 2019). The threshold is high: factual findings are "clearly
erroneous only if, after considering all the evidence, we
cannot avoid or ignore a definite and firm conviction that a
mistake has been made." *United States v. Burnside*, 588 F.3d
511, 517 (7th Cir. 2009) (internal citations and quotation marks
omitted); *see also United States v. Thurman*, 889 F.3d 356, 366
(7th Cir. 2018) (noting that we defer to district courts for
credibility determinations "because, unlike our review of
transcripts, the district court had the opportunity to listen to
testimony and observe the demeanor of witnesses at the sup-
pression hearing") (internal citations and quotation marks
omitted).

Huskisson's protests do not clear that bar. The district
court faithfully applied the standards we laid out in *Markling*
and *Etchin* to determine the government's motives in filing

the search warrant application. The court carefully weighed the evidence from both sides; when faced with two inconsistent statements from the same witness, the court credited one based on the totality of the evidence. In so doing, the district court concluded that an errant statement by Detective Kinney did not outweigh the other evidence of the government's plan to request a search warrant, regardless of what they found in the house. This was not a "one-off," ill-considered decision by the district court. Rather, before, during, and after the jury trial, the court closely tracked the issue with its superior vantage point hearing and seeing the witnesses and presiding over the presentation of all the evidence.[4] This decision was well-reasoned and well-supported, so we do not reverse it.

### III. Conclusion

All agree: the DEA entry team entered Huskisson's house unlawfully. We do not condone this illegal behavior by law enforcement; the better practice is to obtain a warrant before entering a home. Ordinarily, the evidence found here would be excluded. But because the government had so much other evidence of probable cause, and had already planned to apply for a warrant before the illegal entry, the evidence is admissible. Though the government should not profit from its bad behavior, neither should it be placed in a worse position than

---

[4] *See* Order Den. Mot. to Suppress at 9–10, ECF No. 76; Order Den. Pretrial Mot. at 6, ECF No. 165 (denying defendant's motion to reconsider denial of suppression motion); Trial Tr. vol. 2 at 298–99, ECF No. 211 (posttrial order again denying motion to suppress). Additionally, as noted above, at trial three DEA agents testified the plan was always to seek a warrant once Hardy had confirmed there were drugs in Huskisson's home.

it would otherwise have occupied. *See Murray*, 487 U.S. at 542. Accordingly, we AFFIRM the district court.